[No. S115154. Aug. 11, 2005.]

ELYSA J. YANOWITZ, Plaintiff and Appellant, v.
L'OREAL USA, INC., Defendant and Respondent.

## COUNSEL

Herbert W. Yanowitz and Joseph R. Grodin for Plaintiff and Appellant.

William R. Tamayo, Eric S. Dreiband, Lorraine C. Davis, Vincent Blackwood and Elizabeth E. Theran for U.S. Equal Employment Opportunity Commission as Amicus Curiae on behalf of Plaintiff and Appellant.

Law Offices of Jeffrey K. Winikow and Jeffrey K. Winikow for California Employment Lawyers Association as Amicus Curiae on behalf of Plaintiff and Appellant.

Charlotte E. Fishman for Equal Rights Advocates, Asian Law Caucus, California Women's Law Center, Disability Rights Education and Defense Fund, Inc., The Impact Fund, The Legal Aid Society-Employment Law Center, Mexican American Legal Defense and Education Fund, The National Women's Law Center and Women's Employment Rights Clinic as Amici Curiae on behalf of Plaintiff and Appellant.

Morgenstein & Jubelirer, William J. Carroll and David H. Bromfield for Defendant and Respondent.

Mitchell Silberberg & Knupp, Lawrence A. Michaels and Suzanne M. Steinke for California Employment Law Council as Amicus Curiae on behalf of Defendant and Respondent.

Ballard, Rosenberg, Golper & Savitt, Linda Miller Savitt, John J. Manier and Christine T. Hoeffner as Amici Curiae on behalf of Defendant and Respondent.

Pillsbury Winthrop, George S. Howard, Jr., and Brian L. Johnson for Employers Group as Amicus Curiae on behalf of Defendant and Respondent.

## OPINION

**GEORGE, C. J.**—Plaintiff Elysa J. Yanowitz was a regional sales manager employed by defendant L'Oreal USA, Inc. (L'Oreal), a prominent cosmetics and fragrance company. Yanowitz alleges that after she refused to carry out an order from a male supervisor to terminate the employment of a female sales associate who, in the supervisor's view, was not sufficiently sexually attractive or "hot," she was subjected to heightened scrutiny and increasingly hostile adverse treatment that undermined her relationship with the employees she supervised and caused severe emotional distress that led her to leave her position. In bringing this action against L'Oreal, Yanowitz contended, among other matters, that L'Oreal's actions toward her constituted unlawful retaliation in violation of the provisions of Government Code section 12940, subdivision (h) (section 12940(h)), which forbids employers from retaliating against employees who have acted to protect the rights afforded by the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).[1]

Section 12940(h) makes it an unlawful employment practice for an employer "to discharge, expel, or otherwise discriminate against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." In this case, we are presented with an array of issues regarding the proper legal standards to apply in determining whether an allegedly retaliatory action by an employer is actionable under section 12940(h). First, we must decide whether an employee's refusal to follow a supervisor's order (to discharge a subordinate) that the employee reasonably believes to be discriminatory constitutes "protected activity" under the FEHA for which the employee may not properly be subjected to retaliation, when the employee objects to the supervisor's order but does not explicitly tell the supervisor or the employer that she (the employee) believes the order violates the FEHA or is otherwise discriminatory. Second, we must decide how the term "adverse employment action"—a term of art that generally is used as a shorthand description of the kind of adverse treatment imposed upon an

---

[1] All further statutory references are to the Government Code, unless otherwise indicated.

employee that will support a cause of action under an employment discrimination statute—should be defined for purposes of a retaliation claim under the FEHA, and whether, in evaluating whether or not an employee was subjected to an adverse employment action under the appropriate standard, each individual sanction or punitive measure to which the employee was subjected must be evaluated separately or instead collectively through consideration of the totality of the circumstances. On a related point, we must decide whether a plaintiff may invoke the continuing violation doctrine to rely upon allegedly retaliatory acts that occurred outside the limitations period when such acts are related to acts that occur within the limitations period prescribed by the FEHA. Finally, in light of our conclusions on the foregoing issues, we must determine whether, under the circumstances disclosed by the record in this case, the Court of Appeal properly concluded that the trial court erred in granting summary judgment in favor of the employer.

For the reasons set forth below, we conclude that an employee's refusal to follow a supervisor's order that she reasonably believes to be discriminatory constitutes protected activity under the FEHA and that an employer may not retaliate against an employee on the basis of such conduct when the employer, in light of all the circumstances, knows that the employee believes the order to be discriminatory, even when the employee does not explicitly state to her supervisor or employer that she believes the order to be discriminatory. Second, we conclude that the proper standard for defining an adverse employment action is the "materiality" test, a standard that requires an employer's adverse action to materially affect the terms and conditions of employment (see *Akers v. County of San Diego* (2002) 95 Cal.App.4th 1441, 1454–1457 [116 Cal.Rptr.2d 602]), rather than the arguably broader "deterrence" test adopted by the Court of Appeal in the present case. We further conclude that in determining whether an employee has been subjected to treatment that materially affects the terms and conditions of employment, it is appropriate to consider the totality of the circumstances and to apply the "continuing violation" doctrine that we recently adopted in *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798 [111 Cal.Rptr.2d 87, 29 P.3d 175] (*Richards*). Finally, applying these general principles to the record that was before the trial court on the summary judgment motion, we conclude the Court of Appeal properly determined that the trial court erred in granting summary judgment in favor of the employer.

Accordingly, we shall affirm the judgment of the Court of Appeal, which reversed the summary judgment entered in favor of defendant.

# I.

## A

Because this case comes before us after the trial court granted a motion for summary judgment, we take the facts from the record that was before the trial court when it ruled on that motion. (*State Dept. of Health Services v. Superior Court* (2003) 31 Cal.4th 1026, 1034-35 [6 Cal.Rptr.3d 441, 79 P.3d 556].) " 'We review the trial court's decision de novo, considering all the evidence set forth in the moving and opposing papers except that to which objections were made and sustained.' " (*Id.* at p. 1035.) We liberally construe the evidence in support of the party opposing summary judgment and resolve doubts concerning the evidence in favor of that party. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Cal.4th 1138, 1142 [12 Cal.Rptr.3d 615, 88 P.3d 517].)

Yanowitz began her employment with the predecessor of L'Oreal as a sales representative in 1981[2] and was promoted to regional sales manager for Northern California and the Pacific Northwest in 1986. As regional sales manager, Yanowitz was responsible for managing L'Oreal's sales team and dealing with the department and specialty stores that sold L'Oreal's fragrances. From 1986 to 1996, Yanowitz's performance as a regional sales manager consistently was judged as "Above Expectation" and in some instances fell close to "Outstanding," the highest possible rating, although her reviews over this period also consistently contained some criticism of her "listening" and "communication" skills.

In early 1997, Yanowitz was named L'Oreal's regional sales manager of the year (for 1996). She received a Cartier watch and a congratulatory note from human resources manager Jane Sears praising her leadership, loyalty, motivation, and ability to inspire team spirit. Yanowitz's bonuses for the years 1996 and 1997 were the highest paid to any regional sales manager in her division.

Beginning in 1996, Yanowitz's immediate supervisor was Richard Roderick, the vice-president of sales for the designer fragrance division. Roderick reported directly to Jack Wiswall, the general manager of the designer fragrance division. Roderick and Wiswall worked out of New York, and Yanowitz was based in San Francisco.

In June 1997, Roderick wrote a memorandum to Yanowitz's personnel file in which he criticized Yanowitz's listening skills and characterized her

---

[2] L'Oreal formerly was known as Cosmair, Inc. We refer to defendant as L'Oreal throughout.

attitude as "negative." He also noted that he had received complaints about Yanowitz's attitude from several retailers. In August 1997, Roderick wrote a memorandum to Sears, L'Oreal's human resources manager, in which he again criticized Yanowitz for her listening skills and her "negative" attitude, noting that several accounts also had complained about Yanowitz's attitude. Roderick stated in this memorandum that "Elysa does a terrific job as a regional manager, however, she must become a better listener and she must not put a gun to the heads of the retailers in order to get them to do what needs to be done."

In the fall of 1997, L'Oreal restructured the designer fragrance division, merging the division with the Ralph Lauren fragrance division. Although some regional sales managers were laid off after the restructuring, L'Oreal retained Yanowitz and increased her responsibilities. After the merger and restructuring, Yanowitz was assigned to supervise the personnel who formerly worked for the Ralph Lauren division, and to supervise the marketing of Ralph Lauren fragrances in her region.

Shortly after Yanowitz assumed responsibility for the Ralph Lauren sales force and marketing campaigns in the fall of 1997, Wiswall and Yanowitz toured the Ralph Lauren Polo installation at Macy's in the Valley Fair Shopping Center in San Jose. After the tour, Wiswall instructed Yanowitz to terminate the employment of a dark-skinned female sales associate because he did not find the woman to be sufficiently physically attractive. Wiswall expressed a preference for fair-skinned blondes and directed Yanowitz to "[g]et me somebody hot," or words to that effect. On a return trip to the store, Wiswall discovered that the sales associate had not been dismissed. He reiterated to Yanowitz that he wanted the associate terminated and complained that Yanowitz had failed to do so. He passed "a young attractive blonde girl, very sexy," on his way out, turned to Yanowitz, and told her, "God damn it, get me one that looks like that." Yanowitz asked Wiswall for an adequate justification before she would terminate the associate. On several subsequent occasions, Wiswall asked Yanowitz whether the associate had been dismissed. On each occasion, Yanowitz asked Wiswall to provide adequate justification for dismissing the associate. In March 1998, in the midst of Yanowitz's conversations with Wiswall regarding the termination of the sales associate, Yanowitz learned that the sales associate in question was among the top sellers of men's fragrances in the Macy's West chain. Ultimately, Yanowitz refused to carry out Wiswall's order and did not terminate the sales associate. She never complained to her immediate supervisor or to the human resources department that Wiswall was pressuring her to fire the sales associate, however, nor did she explicitly tell Wiswall that she believed his order was discriminatory.

In April 1998, Roderick began soliciting negative information about Yanowitz from her subordinates. Roderick called Christine DeGracia, who reported to Yanowitz, and asked her about any "frustrations" she had with Yanowitz. When DeGracia said she had had some, Roderick asked her to hold her thoughts so that the matter could be discussed with human resources. Roderick and Sears then called back DeGracia to discuss those issues. When Roderick asked DeGracia whether any other persons were having problems with Yanowitz, DeGracia did not provide any names. Two weeks later, Roderick called DeGracia again and told her it was urgent that she help him persuade individuals to come forward with their problems concerning Yanowitz. In early June 1998, Roderick again asked DeGracia to notify him of negative incidents involving Yanowitz and other account executives.

On May 13, 1998, Roderick summoned Yanowitz to L'Oreal's home office in New York. Roderick opened the meeting by asking whether she thought she had been brought in to be terminated, then criticized Yanowitz for her "dictatorial" management style with regard to two account executives. He closed the meeting by saying, "It would be a shame to end an eighteen-year career this way." During May and June 1998, Roderick and Wiswall obtained Yanowitz's travel and expense reports and audited them.

On June 19, 1998, a representative for Macy's West, one of Yanowitz's accounts, wrote to Roderick to complain about the handling of a Polo Sport promotion, which Yanowitz's team was responsible for coordinating. In June 1998, Yanowitz met with Wiswall, Roderick, and various account executives and regional sales managers responsible for the Macy's account. Wiswall screamed at Yanowitz in front of her staff, told her he was "sick and tired of all the fuckups" on the Macy's account, and said that Yanowitz could not get it right. In July 1998, the Macy's account executive wrote to Roderick and again complained about the handling of a different promotion by Yanowitz's team.

On June 22, 1998, Yanowitz wrote Roderick, advising him that her Macy's West team was disturbed about certain issues. Wiswall, who had been sent a copy, wrote a note to Roderick on Yanowitz's memo: "Dick—She is writing everything! Are you!!!???" One week after Wiswall's note, Roderick prepared three memos to human resources documenting the meeting with Yanowitz on May 13, 1998, a conversation with DeGracia on June 4, 1998, and a visit to Yanowitz's market area in early June 1998. These memos were critical of Yanowitz; the memo discussing the May 13 meeting criticized her for being too assertive.

On July 16, 1998, Roderick prepared a more elaborate memorandum and delivered it to Yanowitz. The memorandum criticized Yanowitz's handling of

a Polo Sport promotion, a Picasso promotion, coordination of advertising with others, handling of the Sacramento market, and the length and substance of a March 1998 business trip to Hawaii. Roderick closed, "I have yet to see evidence that you took [the May 13] conversation seriously and made the necessary style modifications. Elysa, I am quite surprised that a person with so many years of experience and so many years with Cosmair could become so ineffective so quickly. [¶] Our business is changing daily and we all must learn to adapt to those changes or we will fail as individuals and as a company. Your changes must start immediately. [¶] I expect a reply to this memo within one week of receipt."

Yanowitz viewed the memorandum as an expression of intent to develop pretextual grounds and then terminate her. She suggested the parties meet to discuss a severance package, but also indicated she first wanted to prepare her written response to the July 16, 1998, memorandum.

Carol Giustino, Sears's replacement as human resources director, set up a meeting for July 22 and rejected Yanowitz's request that the meeting be postponed. Giustino also denied Yanowitz's request to have Yanowitz's attorney-husband present at the meeting, citing company policy. During the July 22 meeting, Roderick and Giustino questioned Yanowitz about the accusations in the July 16 memorandum without reading her written response. Yanowitz, who was being treated for nervous anxiety allegedly brought on by the situation at work, broke down in tears. During the meeting, Roderick imposed a new travel schedule on Yanowitz, a schedule that regulated precisely how often she should visit each market in her territory. Two days after the meeting, Yanowitz departed on disability leave due to stress. She did not return, and L'Oreal replaced her in November 1998.

## B

Yanowitz filed a discrimination charge with the Department of Fair Employment and Housing (DFEH) on June 25, 1999. She alleged that L'Oreal had discriminated against her on the basis of sex, age (Yanowitz was 53), and religion (Yanowitz is Jewish). She also alleged that L'Oreal had retaliated against her for refusing to terminate the female employee whom Wiswall considered unattractive.

After receiving a right-to-sue letter from the DFEH, Yanowitz brought this action against L'Oreal in superior court. The first amended complaint, filed on September 13, 1999, included claims for age and religious discrimination and retaliation under the FEHA, violation of the unfair competition law (UCL), and breach of the covenant of good faith and fair dealing. The second amended complaint, filed July 21, 2000, added a cause of action for negligent infliction of emotional distress.

L'Oreal filed two separate motions for summary adjudication. The first motion challenged Yanowitz's claims under the FEHA and for emotional distress, each of which was based upon L'Oreal's conduct toward Yanowitz in 1998. The second motion challenged Yanowitz's UCL and good faith and fair dealing claims, which arose from L'Oreal's unrelated practice of selling products to distributors other than its primary distributors—high-end department stores and specialty stores. Each motion for summary adjudication ultimately was granted, and judgment was entered in favor of L'Oreal on April 25, 2001.[3]

With respect to the retaliation claim, the trial court granted summary judgment in favor of L'Oreal, finding Yanowitz had not engaged in any protected activity. The Court of Appeal reversed this aspect of the trial court's judgment, holding that: (1) Yanowitz's refusal to obey Wiswall's sexually discriminatory order was protected activity under the FEHA; (2) Yanowitz was not required to give L'Oreal notice that Wiswall's order was discriminatory; (3) Yanowitz was not precluded from relying on L'Oreal's acts that occurred prior to the date of the alleged adverse action shown in the administrative complaint; (4) L'Oreal's conduct constituted an adverse employment action; (5) a genuine issue of material fact remained as to whether L'Oreal's ostensibly nonretaliatory reasons for the adverse employment action were pretextual; (6) a workers' compensation exclusivity requirement did not bar Yanowitz's claim for negligent infliction of emotional distress derivative of her FEHA claim; and (7) L'Oreal's intentional acts could not provide a basis for establishing negligent infliction of emotional distress. The appellate court accordingly concluded that the trial court erred in granting summary judgment in favor of L'Oreal with regard to Yanowitz's retaliation claim and reversed the judgment, remanding the matter to the superior court to permit the retaliation claim to proceed to trial.

L'Oreal petitioned for review, contending (1) with regard to the "protected conduct" issue, that the Court of Appeal had erred in concluding that Yanowitz's acts properly could be considered protected conduct even though Yanowitz had not specifically notified any supervisor that she believed Wiswall's order was discriminatory, and (2) with regard to the "adverse employment action" issue, that the Court of Appeal had erred (a) in adopting an improper standard for evaluating whether an adverse employment action was imposed upon an employee, (b) in aggregating discrete employment actions and considering L'Oreal's conduct under a totality of the circumstances approach, and (c) in applying the continuing violation doctrine to consider adverse actions that occurred outside the statute of limitations

---

[3] Originally, Yanowitz prevailed on a single theory underlying her UCL claim. She dismissed that portion of her suit with prejudice, however, so that a final, appealable judgment could be entered.

period. Finally, L'Oreal maintained that even if the Court of Appeal properly found that Yanowitz had established a prima facie case of retaliation, that court erred in finding that she had presented sufficient evidence to create a triable issue of fact regarding whether L'Oreal's ostensible nondiscriminatory reasons for its actions were pretextual.

In light of the importance of a number of these issues, particularly the proper standard for determining whether an employee has been subjected to an adverse employment action, we granted review.

## II.

Past California cases hold that in order to establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a "protected activity," (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action. (*Iwekaogwu v. City of Los Angeles* (1999) 75 Cal.App.4th 803, 814–815 [89 Cal.Rptr.2d 505]; *Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 476 [4 Cal.Rptr.2d 522] [adopting the title VII (Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.) burden-shifting analysis of *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 802–805 [36 L.Ed.2d 668, 93 S.Ct. 1817]].) Once an employee establishes a prima facie case, the employer is required to offer a legitimate, nonretaliatory reason for the adverse employment action. (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 68 [105 Cal.Rptr.2d 652].) If the employer produces a legitimate reason for the adverse employment action, the presumption of retaliation " ' "drops out of the picture," ' " and the burden shifts back to the employee to prove intentional retaliation. (*Ibid.*)

## A

We first must determine whether Yanowitz's refusal to follow Wiswall's order to terminate the sales associate because he found the associate sexually unattractive was protected activity for which she could not be subjected to retaliation. The statutory language of section 12940(h) indicates that protected conduct can take many forms. Specifically, section 12940(h) makes it an unlawful employment practice "[f]or any employer . . . to discharge, expel, or otherwise discriminate against any person because the person has *opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part*." (Italics added.) The question here is whether Yanowitz's refusal to follow Wiswall's directive qualifies under the first category—that is, whether by refusing the directive, Yanowitz "opposed any practices forbidden under this part."

■ As a threshold matter, L'Oreal does not dispute that an employee's conduct may constitute protected activity for purposes of the antiretaliation provision of the FEHA not only when the employee opposes conduct that ultimately is determined to be unlawfully discriminatory under the FEHA, but also when the employee opposes conduct that the employee reasonably and in good faith believes to be discriminatory, whether or not the challenged conduct is ultimately found to violate the FEHA. It is well established that a retaliation claim may be brought by an employee who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA. (See, e.g., *Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 473 [30 Cal.Rptr.3d 797, 115 P.3d 77]; *Flait v. North American Watch Corp., supra*, 3 Cal.App.4th at p. 477; *Moyo v. Gomez* (9th Cir. 1994) 40 F.3d 982, 985 (*Moyo*); *Gifford v. Atchison, Topeka & Santa Fe Ry. Co.* (9th Cir. 1982) 685 F.2d 1149, 1157).)[4]

Strong policy considerations support this rule. Employees often are legally unsophisticated and will not be in a position to make an informed judgment as to whether a particular practice or conduct *actually* violates the governing antidiscrimination statute. A rule that permits an employer to retaliate against an employee with impunity whenever the employee's reasonable belief turns out to be incorrect would significantly deter employees from opposing conduct they believe to be discriminatory. (See, e.g., *Gifford v. Atchison, Topeka & Santa Fe Ry. Co., supra*, 685 F.2d at p. 1157; *Moyo, supra*, 40 F.3d at p. 985.) As the United States Supreme Court recently emphasized in the context of title IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq.), "[r]eporting incidents of discrimination is integral to Title IX enforcement and would be discouraged if retaliation against those who report went unpunished. Indeed, if retaliation were not prohibited, Title IX's enforcement scheme would unravel." (*Jackson v. Birmingham Board of Education* (2005) 544 U.S. 167 [161 L.Ed.2d 361, 125 S.Ct. 1497, 1508].) By the same token, a rule that would allow retaliation against an employee for opposing conduct the employee reasonably and in good faith believed was discriminatory, whenever the conduct subsequently was found not to violate the FEHA, would significantly discourage employees from opposing incidents of discrimination, thereby undermining the fundamental purposes of the antidiscrimination statutes.

---

[4] As the Seventh Circuit observed with regard to title VII, "[t]he mistake must, of course, be a sincere one; and presumably it must be reasonable . . . for it seems unlikely that the framers of Title VII would have wanted to encourage the filing of utterly baseless charges by preventing employers from disciplining the employees who made them. *But it is good faith and reasonableness, not the fact of discrimination, that is the critical inquiry in a retaliation case.*" (*Rucker v. Higher Educational Aids Bd.* (7th Cir. 1982) 669 F.2d 1179, 1182, italics added.)

■ In the present case, in her opposition to L'Oreal's motion for summary judgment, Yanowitz presented evidence that she reasonably believed that Wiswall's order constituted unlawful sex discrimination, because she thought the order represented the application of a different standard for female sales associates than for male sales associates. Yanowitz stated in this regard that she had hired and supervised both male and female sales associates for a number of years, and never had been asked to fire a male sales associate because he was not sufficiently attractive. Because a trier of fact could find from this evidence that Yanowitz believed Wiswall's order was discriminatory as reflecting an instance of disparate treatment on the basis of sex, we have no occasion in this case to determine whether a gender-neutral requirement that a cosmetic sales associate be physically or sexually attractive would itself be violative of the FEHA or could reasonably be viewed by an employee as unlawfully discriminatory. Courts in other jurisdictions have uniformly held that an appearance standard that imposes more stringent appearance requirements on employees of one sex than on employees of the other sex constitutes unlawful sexual discrimination unless such differential treatment can be justified as a bona fide occupational qualification. (*Frank v. United Airlines, Inc.* (9th Cir. 2000) 216 F.3d 845, 854–855; *Gerdom v. Continental Airlines, Inc.* (9th Cir. 1982) 692 F.2d 602, 608 [in bank]; *Association of Flight Attendants v. Ozark Air Lines* (N.D.Ill. 1979) 470 F.Supp. 1132, 1135; *Laffey v. Northwest Airlines, Inc.* (D.D.C. 1973) 366 F.Supp. 763, 790.) We believe it is clear that such unjustified disparate treatment also would constitute unlawful sex discrimination under the FEHA.

L'Oreal does not claim that such disparate treatment on the basis of sex is permissible under the FEHA, but maintains that the evidence presented at the summary judgment motion was insufficient to support a reasonable belief that Wiswall's order represented an instance of impermissible disparate treatment on the basis of sex. We disagree. Yanowitz presented evidence that Wiswall ordered her to terminate a female sales associate simply because he felt the associate was "not good looking enough," and directed her to "[g]et me someone hot." On a subsequent visit to the Macy's store, when Wiswall discovered Yanowitz had not terminated the sales associate, he pointed out a young attractive blonde woman and stated, "God damn it, get me one that looks like that." Although Yanowitz repeatedly requested that Wiswall provide her with "adequate justification" for the dismissal, he failed to respond to the request. As noted, Yanowitz additionally stated that she had hired and supervised both male and female sales associates for a number of years, and

never had been asked to fire a male sales associate because he was not sufficiently attractive.[5]

Moreover, L'Oreal failed to present any evidence in the summary judgment proceedings to counter the claim that Wiswall's order constituted an instance of disparate treatment on the basis of sex. It introduced no evidence suggesting that Wiswall's order was based upon the particular sales associate's performance or sales record, or, indeed, that Wiswall had any knowledge of such matters. In addition, L'Oreal did not establish that the company maintained a general policy requiring cosmetic sales associates to be physically or sexually attractive, or that such a policy was routinely applied to both male and female sales associates.[6]

L'Oreal additionally asserts that Yanowitz's evidence is insufficient to support a reasonable belief that Wiswall's order was discriminatory, because her belief rests solely on her own subjective experience. Inasmuch as Yanowitz had been a regional sales manager for many years and presumably was familiar with the company's job requirements for sales associates, we believe that a trier of fact properly could find that, in light of Yanowitz's experience, her assessment that Wiswall's order represented disparate treatment on the basis of the sex of the sales associate was reasonable. Accordingly, on this record, we conclude that a reasonable trier of fact could find that Yanowitz reasonably believed that Wiswall's order constituted sexual discrimination.

L'Oreal argues, however, that even if Yanowitz refused to follow Wiswall's order because she reasonably believed it was discriminatory, the papers before the trial court on the summary judgment motion failed to demonstrate that Yanowitz engaged in protected activity, because the materials failed to demonstrate that she ever made L'Oreal aware that her refusal to terminate

---

[5] Additionally, Yanowitz presented evidence that at the time of Wiswall's directive, she was supervising male employees and, notably, that there was a male sales associate working in a Ralph Lauren installation at another Macy's store in Yanowitz's region.

[6] Such evidence clearly would have been relevant to the question at issue. For instance, evidence that Wiswall's directive implemented an established company policy or course of conduct would have a bearing both on the reasonableness of Yanowitz's belief that discrimination had occurred and on Wiswall's understanding that Yanowitz's refusal to implement his directive was based on that belief. Had L'Oreal presented evidence that physical attractiveness was a bona fide occupational qualification for cosmetics sales associates, or that L'Oreal sales managers were routinely, or even occasionally, required to make employment decisions on the basis of physical attractiveness, the reasonableness of Yanowitz's belief that Wiswall's order was discriminatory might be questionable. Moreover, evidence of past practice would bear on Wiswall's knowledge, in that it would be unlikely that a reasonable trier of fact would find that an executive ordering an employee to implement an established, generally applied and gender-neutral company policy would know that the employee's refusal to follow that order was based on a belief that the order was discriminatory.

the sales associate on the basis of her appearance amounted to a protest against unlawful discrimination. L'Oreal's position is that Yanowitz cannot be found to have "opposed" a practice forbidden by the FEHA, within the meaning of 12940(h), because Yanowitz never notified or advised either Wiswall or any other supervisor that she was refusing to obey the order because she believed the order violated the FEHA.

By contrast, although Yanowitz acknowledges that she never explicitly stated to Wiswall that she believed his order was discriminatory, she contends that in light of the nature of the order and her repeated requests that Wiswall provide "adequate justification" for that order, there is sufficient evidence from which a trier of fact could find that Wiswall knew that she had declined to follow the order because she believed it to be discriminatory, and that under such circumstances retaliation on the basis of her conduct was forbidden, even if she did not explicitly tell Wiswall, in so many words, that the order was discriminatory.

 We agree with Yanowitz that when the circumstances surrounding an employee's conduct are sufficient to establish that an employer knew that an employee's refusal to comply with an order was based on the employee's reasonable belief that the order is discriminatory, an employer may not avoid the reach of the FEHA's antiretaliation provision by relying on the circumstance that the employee did not *explicitly* inform the employer that she believed the order was discriminatory. The relevant portion of section 12940(h) states simply that an employer may not discriminate against an employee "because the person has opposed any practices forbidden under this part." When an employer knows that the employee's actions rest on such a basis, the purpose of the antiretaliation provision is applicable, whether or not the employee has told her employer explicitly and directly that she believes an order is discriminatory. (See *Miller v. Department of Corrections, supra*, 36 Cal.4th at pp. 473–476.)

 Standing alone, an employee's unarticulated belief that an employer is engaging in discrimination will not suffice to establish protected conduct for the purposes of establishing a prima facie case of retaliation, where there is no evidence the employer knew that the employee's opposition was based upon a reasonable belief that the employer was engaging in discrimination. (See, e.g., *Garcia-Paz v. Swift Textiles, Inc.* (D.Kan. 1995) 873 F.Supp. 547, 559–560 (*Garcia-Paz*) [holding that employee who champions cause of older worker is not engaged in protected activity under the Age Discrimination in Employment Act of 1967 (29 U.S.C. § 621 et seq.), even where employee acts out of "an unarticulated belief that the employer is discriminating on the basis of age . . . unless the activity in question advances beyond advocacy and into recognizable opposition to an employment practice that the claimant

reasonably believes to be unlawful"].) Although an employee need not formally file a charge in order to qualify as being engaged in protected opposing activity,[7] such activity must oppose activity the employee reasonably believes constitutes unlawful discrimination, and complaints about personal grievances or vague or conclusory remarks that fail to put an employer on notice as to what conduct it should investigate will not suffice to establish protected conduct. (See *Garcia-Paz* at p. 560 ["Employees often do not speak with the clarity or precision of lawyers. At the same time, however, employers need not approach every employee's comment as a riddle, puzzling over the possibility that it contains a cloaked complaint of discrimination"]; *Booker v. Brown & Williamson Tobacco Co.* (6th Cir. 1989) 879 F.2d 1304, 1313–1314 [affirming district court's determination that an allegation of "ethnocism" was too vague to constitute protected opposition under Michigan's antidiscrimination statute].)

Nonetheless, we believe it is clear that "[a]n employee is not required to use legal terms or buzzwords when opposing discrimination. The court will find opposing activity if the employee's comments, when read in their totality, oppose discrimination." (*Wirtz v. Kansas Farm Bureau Services, Inc.* (D.Kan. 2003) 274 F.Supp.2d 1198, 1212, fn. omitted.) It is not difficult to envision circumstances in which a subordinate employee may wish to avoid directly confronting a supervisor with a charge of discrimination and the employee engages in subtler or more indirect means in order to avoid furthering or engaging in discriminatory conduct. As the court explained in *Garcia-Paz*, in such circumstances "the thrust of inartful, subtle, or circumspect remarks nevertheless may be perfectly clear to the employer, and [there is] no evidence that Congress intended to protect only the impudent or articulate. The relevant question . . . is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner." (*Garcia-Paz, supra,* 873 F.Supp. at p. 560.)

Thus, in the present case we must determine whether, on the record before the trial court on the motion for summary adjudication, a trier of fact properly could find that Wiswall knew that Yanowitz was objecting repeatedly to the order because she believed in good faith that it was discriminatory. As noted

---

[7] Courts consistently have recognized that in enacting antiretaliation provisions, legislators sought to protect a wide range of activity in addition to the filing of a formal complaint. (See, e.g., *EEOC v. Crown Zellerbach Corp.* (9th Cir. 1983) 720 F.2d 1008, 1012–1014 [writing letter to customer of employer complaining about inadequacies in employer's affirmative action program]; *Payne v. McLemore's Wholesale & Retail Stores* (5th Cir. 1981) 654 F.2d 1130, 1136–1137 [boycotting and picketing of store]; *Coleman v. Wayne State University* (E.D.Mich. 1987) 664 F.Supp. 1082, 1092 & fn. 5 [stating repeatedly in public and private that university engaged in discriminatory employment practices].)

above, Wiswall on multiple occasions directed Yanowitz to fire a sales associate he believed was insufficiently attractive, and on one occasion pointed to an attractive blonde woman while indicating his preference for hiring a sales associate who looked like her. Yanowitz refused to implement Wiswall's directive and repeatedly asked for "adequate justification" for that order. There is no evidence in the record that Wiswall ever asked Yanowitz to explain her numerous requests for "adequate justification," and L'Oreal failed to present any evidence regarding Wiswall's understanding or knowledge of Yanowitz's reasons for refusing to follow his directive or for demanding "adequate justification" for that directive.

We conclude that, on this record, a trier of fact properly could find that Wiswall knew that Yanowitz's refusal to comply with his order to fire the sales associate was based on Yanowitz's belief that Wiswall's order constituted discrimination on the basis of sex—that is, the application of a different standard to a female employee than that applied to male employees—and that her opposition to the directive thus was not merely an unexplained insubordinate act bearing no relation to suspected discrimination. (See *Nelson v. Kansas* (D.Kan., May 24, 2001, No. 99-4184-DES) 2001 WL 584436 at p. * 7 [fact that plaintiff used the words "unprofessional" and "disappointing" rather than "discrimination" or "sexual harassment" in incident report detailing the circumstances of a sexual joke or conversation "does not alter the fact that the incident report sufficiently conveyed plaintiff's reasonable concern that defendant engaged in sexual harassment"].) A trier of fact properly could find that by repeatedly refusing to implement the directive unless Wiswall provided "adequate justification," Yanowitz sufficiently conveyed to Wiswall that she considered the order to be discriminatory and put him on notice that he should reconsider the order because of its apparent discriminatory nature.

 In sum, we conclude that the evidence presented by Yanowitz would permit—although it certainly would not compel—a reasonable trier of fact to find that, in view of the nature of Wiswall's order, Yanowitz's refusal to implement the order, coupled with her multiple requests for "adequate justification," sufficiently communicated to Wiswall that she believed that his order was discriminatory. (See *Truskoski v. ESPN, Inc.* (D.Conn. 1993) 823 F.Supp. 1007, 1012 [holding that complaints about disparate impact of staffing policy (which had "overtones of gender bias and discrimination") constituted protected opposition].) Thus, we conclude that Yanowitz presented sufficient evidence to satisfy the protected activity element of her prima facie case. (*Mathieu v. Norrell Corp.* (2004) 115 Cal.App.4th 1174, 1187 [10 Cal.Rptr.3d 52] [triable issue of fact existed as to whether defendant reasonably understood plaintiff's complaints to raise an issue of sexual harassment, thus constituting protected activity under FEHA].)

## B

We turn next to an issue that generally is referred to in the employment discrimination cases and literature under the rubric of "adverse employment action." This term does not appear in the language of the FEHA or in title VII, but has become a familiar shorthand expression referring to the kind, nature, or degree of adverse action against an employee that will support a cause of action under a relevant provision of an employment discrimination statute. (See *Power v. Summers* (7th Cir. 2000) 226 F.3d 815, 820.) In the present case, the issue before us is the appropriate standard for determining whether an employee has been subjected to an adverse employment action for purposes of a retaliation claim under the FEHA.

We begin with the relevant statutory language. As already indicated, section 12940(h) provides in relevant part that it is an unlawful employment practice for an "employer . . . to discharge, expel, *or otherwise discriminate* against any person because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (Italics added.) The FEHA does not expressly define "discriminate" or "otherwise discriminate" as used in section 12940(h), but section 12940, subdivision (a) (hereafter section 12940(a))—the initial and basic antidiscrimination provision of the FEHA applicable to employers—provides in somewhat similar fashion that it is an unlawful employment practice for an "employer, because of the race, religious creed, color, national origin, ancestry, physical disability, mental disability, medical condition, marital status, sex, age or sexual orientation of any person to refuse to hire or employ the person or to refuse to select the person for a training program leading to employment, or to bar or to discharge the person from employment or from a training program leading to employment, *or to discriminate against the person in compensation or in terms, conditions or privileges of employment.*" (Italics added.)

L'Oreal contends that the language "or otherwise discriminate" in section 12940(h) reasonably should be interpreted to refer to the same category of adverse employment measures or sanctions that are set forth in section 12940(a)—that is, in general terms, discrimination in the "terms, conditions or privileges of employment." L'Oreal maintains in this regard that it is most reasonable to conclude that the Legislature intended to provide a comparable level of protection to those employees who are discriminated against in retaliation for their opposition to discriminatory practices as is afforded to those employees who are directly discriminated against on the basis, for example, of their race or sex, and employed the term "otherwise discriminate" in section 12940(h) to refer to the category of discriminatory adverse employment actions set forth in section 12940(a).

In contrast, Yanowitz, embracing the position adopted by the Court of Appeal's decision in the present case, asserts that because the "otherwise discriminate" language in section 12940(h) does not contain the descriptive or limiting language that appears in section 12940(a) referring specifically to discrimination "in the terms, conditions, or privileges of employment," section 12940(h) properly should be interpreted to protect employees against a range of adverse employment actions broader than those that fall within the reach of section 12940(a). Yanowitz urges this court to adopt the standard set forth by the Court of Appeal, under which an employee may prevail in an action against an employer for improper retaliation not only when the employee has been subjected to the type of discrimination in the "terms, conditions, or privileges of employment" that would support a cause of action under section 12940(a), but also when he or she has been subjected to any other action "that is reasonably likely to deter employees from engaging in protected activities"—that is, activities protected by section 12940(h).

██ The standard adopted by the Court of Appeal—the "deterrence standard"—does not appear unreasonable when one focuses on the purpose or objective of section 12940(h) viewed in isolation.[8] When the provisions of section 12940 are viewed as a whole, however, we believe it is more reasonable to conclude that the Legislature intended to extend a comparable degree of protection both to employees who are subject to the types of basic forms of discrimination at which the FEHA is directed—that is, for example, discrimination on the basis of race or sex—and to employees who are discriminated against in retaliation for opposing such discrimination, rather than to interpret the statutory scheme as affording a greater degree of protection against improper retaliation than is afforded against direct discrimination. (Accord, e.g., *Von Gunten v. Maryland* (4th Cir. 2001) 243 F.3d 858, 863, fn. 1 [" 'Congress has not expressed a stronger preference for preventing retaliation under § 2000e-3 than for preventing actual discrimination under § 2000e-2,' and '[i]n the absence of strong contrary policy considerations, conformity between the provisions of Title VII is to be preferred' "]; *Richardson v. New York State Dept. of Corr. Ser.* (2d Cir. 1999) 180 F.3d 426, 446; *Brown v. Brody* (D.C. Cir. 1999) 339 U.S. App. D.C. 233 [199 F.3d 446, 458].) Accordingly, we conclude that the term "otherwise discriminate" in section 12940(h) should be interpreted to refer to and encompass the same forms of adverse employment activity that are actionable under section

---

[8] Under the deterrence standard, a sanction or adverse measure to which an employee is subjected in retaliation for protected conduct is actionable so long as the employer's action is "reasonably likely to deter employees from engaging in protected activity." (*Ray v. Henderson* (9th Cir. 2000) 217 F.3d 1234, 1243) [adopting the definition of adverse employment action propounded in the Equal Employment Opportunity Commission's Compliance Manual, which interprets an adverse employment action as " 'any adverse treatment that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity.' "].)

12940(a).[9] Although the federal courts' interpretation of the comparable provisions of title VII is not determinative of the proper interpretation of the provisions of the FEHA, we note in this regard that the overwhelming majority of federal courts that have addressed the issue similarly have concluded that in order to maintain an action under the antiretaliation provision of title VII, an employee must demonstrate that he or she has been subjected to an adverse employment action that materially affects the terms, conditions, or privileges of employment, rather than simply that the employee has been subjected to an adverse action or treatment that reasonably would deter an employee from engaging in the protected activity.[10]

---

[9] Courts adopting this approach have held that, to be actionable, an employer's adverse conduct must materially affect the terms and conditions of employment. (See *Akers v. County of San Diego, supra,* 95 Cal.App.4th at pp. 1454–1457; *Thomas v. Department of Corrections* (2000) 77 Cal.App.4th 507, 510–512 [91 Cal.Rptr.2d 770].)

[10] The Court of Appeal's adoption of the deterrence test in the present case created a conflict with *Thomas v. Department of Corrections, supra,* 77 Cal.App.4th 507, and *Akers v. County of San Diego, supra,* 95 Cal.App.4th 1441. The conflict among our Courts of Appeal mirrors the conflict in the federal courts. (See generally Wiles, *Defining Adverse Employment Action In Title VII Claims For Employer Retaliation: Determining The Most Appropriate Standard* (2001) 27 U. Dayton L.Rev. 217.)

The most stringent test, embraced by the Fifth and Eight Circuits, holds that only "ultimate employment decisions," such as demotion or discharge, can be the basis for retaliation claims (*Dollis v. Rubin* (5th Cir. 1995) 77 F.3d 777, 781–782 [holding that "Title VII was designed to address ultimate employment decisions, not to address every decision made by employers that arguably might have some tangential effect upon those ultimate decisions"]; *Ledergerber v. Stangler* (8th Cir. 1997) 122 F.3d 1142, 1144 [holding that only adverse employment actions that "rise to the level of an ultimate employment decision [are] intended to be actionable under Title VII"].)

At the other end of the spectrum is the "deterrence test" adopted by the Court of Appeal here. As previously noted, this test defines an adverse action as one that is based on a retaliatory motive and is reasonably likely to deter the charging party or others from engaging in protected activity. The Ninth Circuit is the only federal Court of Appeals to adopt this standard. (See *Ray v. Henderson, supra,* 217 F.3d 1234, 1243.)

The Tenth and Eleventh Circuits generally have avoided adopting a uniform standard and instead utilize a case-by-case approach that takes into account all relevant circumstances in a given case. (See, e.g., *Jeffries v. Kansas* (10th Cir. 1998) 147 F.3d 1220, 1232 [explicitly stating that the Tenth Circuit takes a case-by-case approach to what constitutes adverse employment action, and expressly rejecting any requirement that an employer's action be "material" to the terms and conditions of employment in order to be actionable]; *Wideman v. Wal-Mart Stores, Inc.* (11th Cir. 1998) 141 F.3d 1453, 1456 [finding that written reprimands, an employer's solicitation of negative comments by coworkers, and a one-day suspension constituted adverse employment actions].)

Courts in the First and Third Circuits also have taken a broad view of the type of activity that constitutes adverse employment action but have required that the adverse action alter the terms, conditions, or privileges of employment. (See, e.g., *Randlett v. Shalala* (1st Cir. 1997) 118 F.3d 857, 862 [incorporating by reference the "terms, conditions and privileges of employment" qualifier in title VII's general discrimination provision into the adverse action determination in a title VII retaliation claim]; *Robinson v. City of Pittsburgh* (3d Cir. 1997)

 Although Yanowitz argues that our adoption of the foregoing conclusion—that is, interpreting section 12940(h) as affording those employees who engage in protected activities protection against only the same range of adverse employment actions that are prohibited by section 12940(a)—will leave such employees with an inadequate degree of protection and vulnerable to a broad range of retaliatory measures, we believe this argument rests, at least in part, on an unduly narrow view of the type of adverse employment actions that are forbidden by section 12940(a). Retaliation claims are inherently fact-specific, and the impact of an employer's action in a particular case must be evaluated in context. Accordingly, although an adverse employment action must materially affect the terms, conditions, or privileges of employment to be actionable, the determination of whether a particular action or course of conduct rises to the level of actionable conduct should take into account the unique circumstances of the affected employee as well as the workplace context of the claim.[11]

As the United States Supreme Court recognized in interpreting and applying the provisions of title VII in *Harris v. Forklift Systems, Inc.* (1993) 510 U.S. 17 [126 L.Ed.2d 295, 114 S.Ct. 367], the statutory language protecting employees against racial or sexual discrimination in compensation or in the terms, conditions, or privileges of employment is not limited to adverse employment actions that impose an economic detriment or inflict a tangible psychological injury upon an employee. In *Harris* (a sexual harassment case), after quoting the language of title VII (42 U.S.C. § 2000e-2(a)(1)) making it an unlawful employment practice " 'to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment,' " the high court went on to explain that "this language 'is not limited to "economic" or "tangible" discrimination. *The phrase "terms, conditions, or privileges of employment" evinces a congressional intent "to strike at the entire spectrum of disparate treatment of men and women" in employment,' which includes requiring people to work in a discriminatorily hostile or abusive environment.* [Citations.] When the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' [citation] that is 'sufficiently

---

120 F.3d 1286, 1300 ["retaliatory conduct must be serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment . . . [to] constitute [an] 'adverse employment action' "].)

Finally, the remaining circuits expressly have adopted the materiality standard, which holds that a retaliation claim lies only for an employment action that materially affects the terms and conditions of employment. (See, e.g., *Torres v. Pisano* (2nd Cir. 1997) 116 F.3d 625, 640 [to show an adverse employment action employee must demonstrate "a materially adverse change in the terms and conditions of employment"]; *Nguyen v. City of Cleveland* (6th Cir. 2000) 229 F.3d 559, 566; *Von Gunten v. Maryland, supra,* 243 F.3d 858; *Ribando v. United Airlines, Inc.* (7th Cir. 1999) 200 F.3d 507, 510–511; *Brown v. Brody, supra,* 199 F.3d at p. 457.)

[11] Moreover, as we discuss in detail, *post,* considering an employer's actions in context comports with our conclusion that it is appropriate to consider plaintiff's allegations collectively under a totality-of-the circumstances approach.

severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment' [citation], Title VII is violated. [¶] *This standard, which we reaffirm today, takes a middle path between making actionable any conduct that is merely offensive and requiring the conduct to cause a tangible psychological injury.* As we pointed out in *Meritor* [*Savings Bank v. Vinson* (1986) 477 U.S. 57, 67 [91 L.Ed.2d 49, 106 S.Ct. 2399]], 'mere utterance of an . . . epithet which engenders offensive feelings in an employee,' . . . does not sufficiently affect the conditions of employment to implicate Title VII. . . . [¶] But Title VII comes into play before the harassing conduct leads to a nervous breakdown. *A discriminatorily abusive work environment, even one that does not seriously affect employees' psychological well-being, can and often will detract from employees' job performance, discourage employees from remaining on the job, or keep them from advancing in their careers.* . . . [¶] . . . Certainly Title VII bars conduct that would seriously affect a reasonable person's psychological well-being, but the statute is not limited to such conduct. So long as the environment would reasonably be perceived, and is perceived, as hostile or abusive [citation], there is no need for it also to be psychologically injurious. [¶] This is not, and by its nature cannot be, a mathematically precise test. We need not answer today all the potential questions it raises . . . . But we can say that whether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance. The effect on the employee's well-being is, of course, relevant to determining whether the plaintiff actually found the environment abusive. But while psychological harm, like any other relevant factor, may be taken into account, no single factor is required." (*Harris, supra,* 510 U.S. at pp. 21–23, fns. omitted, italics added.)

 As the high court concluded in *Harris* with respect to the comparable language embodied in title VII, we believe that the language in section 12940(a) making it an unlawful employment practice for an employer to discriminate against an employee on the basis of race, sex, or the other enumerated characteristics "in compensation or in the terms, conditions, and privileges of employment" properly must be interpreted broadly to further the fundamental antidiscrimination purposes of the FEHA.[12] Appropriately viewed, this provision protects an employee against unlawful discrimination

---

[12] Although *Harris* was a sexual harassment case, the high court's reasoning applies with equal vigor in the retaliation context. Indeed, in *Noviello v. City of Boston* (1st Cir. 2005) 398 F.3d 76, the First Circuit recently concluded that a hostile work environment can constitute a retaliatory adverse employment action under both title VII and under analogous Massachusetts state law. (*Id.* at p. 89.) The court characterized this approach as the "majority view" under federal law. (See *ibid.* and cases cited therein.)

with respect not only to so-called ultimate employment actions such as termination or demotion, but also the entire spectrum of employment actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement in his or her career. ▮ Although a mere offensive utterance or even a pattern of social slights by either the employer or coemployees cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment for purposes of section 12940(a) (or give rise to a claim under section 12940(h)),[13] the phrase "terms, conditions, or privileges" of employment must be interpreted liberally and with a reasonable appreciation of the realities of the workplace in order to afford employees the appropriate and generous protection against employment discrimination that the FEHA was intended to provide.[14]

▮ As the high court recognized in *Harris*, the determination of what type of adverse treatment properly should be considered discrimination in the terms, conditions, or privileges of employment is not, by its nature, susceptible to a mathematically precise test, and the significance of particular types of adverse actions must be evaluated by taking into account the legitimate interests of both the employer and the employee. Minor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable, but adverse treatment that is reasonably likely to impair a reasonable employee's job

---

[13] See, e.g., *Torres v. Pisano, supra*, 116 F.3d at page 640 (fact that acts left employee feeling "frightened" and "humiliated" failed to establish that employee suffered an adverse employment action); *Ruggieri v. Harrington* (E.D.N.Y. 2001) 146 F.Supp.2d 202, 216 (circumstance that plaintiff was embarrassed by employer's actions inadequate to demonstrate adverse employment action); *Flaherty v. Gas Research Inst.* (7th Cir. 1994) 31 F.3d 451, 457 (plaintiff's "bruised ego" as a result of transfer that plaintiff found "personally humiliating" insufficient to constitute adverse employment action); *Welsh v. Derwinski* (1st Cir. 1994) 14 F.3d 85, 86 (recognizing that "not every unpleasant matter . . . creates a cause of action" under title VII); *Brooks v. City of San Mateo* (9th Cir. 2000) 229 F.3d 917, 929 ("[b]ecause an employer cannot force employees to socialize with one another, ostracism suffered at the hands of coworkers cannot constitute an adverse employment action"); *Strother v. Southern Cal. Permanente Medical Group* (9th Cir. 1996) 79 F.3d 859, 869 (mere ostracism in the workplace is insufficient to establish an adverse employment decision).

[14] The FEHA advances the fundamental public policy of eliminating discrimination in the workplace, and the provisions of the act are to be construed broadly and liberally in order to accomplish its purposes. (§ 12940(a).) Indeed, as we have stated, a "policy that promotes the right to seek and hold employment free of prejudice is fundamental. Job discrimination 'foments domestic strife and unrest, deprives the state of the fullest utilization of its capacities for development and advance, and substantially and adversely affects the interest of employees, employers, and the public in general.' [(Quoting § 12920.)] The statute's aim is to provide effective remedies against the evil." (*Commodore Home Systems, Inc. v. Superior Court* (1982) 32 Cal.3d 211, 220 [185 Cal.Rptr. 270, 649 P.2d 912].)

performance or prospects for advancement or promotion falls within the reach of the antidiscrimination provisions of sections 12940(a) and 12940(h).[15]

## III.

In light of the foregoing conclusions, we turn to the specific employer acts here at issue. Yanowitz contends that the following activity constitutes adverse employment actions for purposes of her prima facie claim: (1) unwarranted negative performance evaluations (specifically, Roderick's July 16, 1998 memo criticizing Yanowitz); (2) L'Oreal's refusal to allow Yanowitz to respond to the allegedly unwarranted criticism, by insisting on the July 22, 1998 meeting despite Yanowitz's request to postpone the meeting to allow her to prepare a defense to the charges; (3) unwarranted criticism voiced by Roderick in the presence of Yanowitz's associates and other employees on May 13, 1998, and the "humiliating" public reprobation by Wiswall on June 11, 1998; (4) refusing Yanowitz's request to provide necessary resources and assistance to Christine DeGracia (sometime after May 13, 1998), thereby allegedly fueling the employee resentment for which Yanowitz was chastised in her performance reviews; and (5) Roderick's solicitation of negative feedback from Yanowitz's staff in April 1998.

As a threshold matter, we need not and do not decide whether each alleged retaliatory act constitutes an adverse employment action in and of itself. Yanowitz has alleged that L'Oreal's actions formed a pattern of systematic retaliation for her opposition to Wiswall's discriminatory directive. Contrary to L'Oreal's assertion that it is improper to consider collectively the alleged retaliatory acts, there is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries. (See, e.g., *Bass v. Board of County Comm'rs, Orange County, Fla.* (11th Cir. 2001) 256 F.3d 1095, 1118 [retaliatory actions that did not deprive plaintiff of compensation and may not have individually constituted adverse employment actions were, when viewed collectively, actionable]; *Wideman v. Wal-Mart Stores, Inc., supra*, 141 F.3d at p. 1456 ["It is enough to conclude, as we do, that the actions about which Wideman complains considered collectively are sufficient to constitute prohibited [retaliation]. We need not and do not decide whether anything less than the totality of the alleged

---

[15] See, e.g., *Wyatt v. City of Boston* (1st Cir. 1994) 35 F.3d 13, 15–16 (stating that actions other than discharge are covered by title VII's antiretaliation provision and listing, as examples, "employer actions such as demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative job evaluations and toleration of harassment by other employees"); *Wideman v. Wal-Mart Stores, Inc., supra*, 141 F.3d 1453, 1456 (finding that written reprimands, an employer's solicitation of negative comments by coworkers, and a one-day suspension constituted adverse employment actions).

reprisals would be sufficient"].) Enforcing a requirement that each act separately constitute an adverse employment action would subvert the purpose and intent of the statute.[16]

 It is therefore appropriate that we consider plaintiff's allegations collectively. L'Oreal additionally argues, however, that in any event we may not consider the full range of acts, because only acts that occurred within one year prior to the filing of Yanowitz's claim with the DFEH—that is, within one year prior to June 25, 1999—are actionable and the remaining acts are barred by the statute of limitations. L'Oreal urges us to apply the statute of limitations strictly and limit Yanowitz's claims to only those acts that occurred one year or less before she filed her DFEH claim—namely, Roderick's July 16, 1998 memorandum, the refusal to give Yanowitz additional time to respond to that memorandum, and the July 22, 1998 meeting. Conversely, Yanowitz urges us to apply the continuing violation doctrine we recently discussed in *Richards, supra,* 26 Cal.4th 798. Under that doctrine, an employer is liable for actions that take place outside the limitations period if these actions are sufficiently linked to unlawful conduct that occurred within the limitations period. (*Id.* at p. 812.)

In *Richards,* we applied the continuing violation doctrine to a plaintiff's disability accommodation and disability harassment claims under the FEHA, reasoning that the FEHA statute of limitations should not be interpreted to force upon a disabled employee engaged in the process of seeking reasonable accommodation or ending disability harassment the unappealing choice of resigning at the first sign of discrimination or, on the other hand, persisting in the reconciliation process and possibly forfeiting a valid claim should that process prove unsuccessful. (*Richards, supra,* 26 Cal.4th at p. 821.) Thus, we held that when an employer unlawfully refuses reasonable accommodation of a disabled employee or engages in disability harassment, the statute of limitations begins to run either "when the course of conduct is brought to an end, as by the employer's cessation of such conduct or by the employee's resignation, *or* when the employee is on notice that further efforts to end the unlawful conduct will be in vain." (*Id.* at p. 823.)

---

[16] Nor is there any merit in L'Oreal's contention that viewing the allegedly retaliatory acts collectively is improper because such an approach conflates the difference between discrimination or retaliation claims and hostile environment claims. (See *Kim v. Nash Finch Co.* (8th Cir. 1997) 123 F.3d 1046, 1060 [holding that reduction of duties, disciplinary action, and negative personnel reports, as well as required remedial training, constituted adverse employment actions and refusing to decide whether each alleged retaliatory act by itself constituted adverse action, because plaintiff "essentially claimed that [his employer] had systematically retaliated against him, that is, that all the acts were taken in response to his filing the employment discrimination charge and were thus connected to one another"].) Moreover, "workplace harassment, if sufficiently severe or pervasive, may in and of itself constitute an adverse employment action sufficient to satisfy the second prong of the prima facie case for . . . retaliation cases." (*Noviello v. City of Boston, supra,* 398 F.3d at p. 89.)

Subsequent to our decision in *Richards*, the United States Supreme Court decided *National Railroad Passenger Corporation v. Morgan* (2002) 536 U.S. 101 [136 L.Ed.2d 106, 122 S.Ct. 2061] (*Morgan*), where the court held that, with regard to the applicability of the continuing violation doctrine, a distinction should be drawn between discrimination and retaliation claims on the one hand, and hostile work environment claims on the other hand. The court in *Morgan* reasoned that because title VII's definition of "unlawful employment practices" includes many discrete acts but does not indicate that the term "practice" converts related discrete acts into a single unlawful practice for timely filing purposes, discrete discriminatory acts are not actionable if time-barred, even when they are related to acts alleged in timely filed charges. (536 U.S. at pp. 110–113.) The court further stated that hostile work environment claims, by contrast, by their very nature involve repeated conduct and thus cannot be said to occur on any particular day. Because a harassment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice," the court in *Morgan* concluded that it does not matter that some of the component parts fall outside the statutory time period. (*Id.* at pp. 116–118.)

L'Oreal urges us to adopt *Morgan*'s reasoning and limit the continuing violation doctrine to only harassment claims, thus excluding discrimination and retaliation claims. A rule categorically barring application of the continuing violation doctrine in retaliation cases, however, would mark a significant departure from the reasoning and underlying policy rationale of our previous cases interpreting the FEHA statute of limitations. In *Richards*, we recognized that such a strict approach to the statute of limitations could encourage early litigation, and that in order to minimize the filing of unripe lawsuits and to promote the conciliatory resolution of claims, the FEHA statute of limitations should be interpreted liberally to allow employers and employees an opportunity to resolve disputes informally. (See *Richards, supra,* 26 Cal.4th at p. 819, citing *Romano v. Rockwell Internat. Inc.* (1996) 14 Cal.4th 479, 493–494 [59 Cal.Rptr.2d 20, 926 P.2d 1114] (*Romano*).) In our earlier decision in *Romano*, these same policy concerns critically informed our decision that a FEHA action for discriminatory discharge does not commence until the actual discharge, not the time the employee was notified that he or she would be discharged. (*Romano, supra,* 14 Cal.4th at pp. 494–495.)

Nothing in *Richards* or *Romano* limited application of these principles to only harassment claims, rather than discrimination or retaliation claims. (See *Birschtein v. New United Motor Manufacturing, Inc.* (2002) 92 Cal.App.4th 994, 1004 [112 Cal.Rptr.2d 347] [remarking that in *Richards*, the "foundation of the court's rationale supporting application of the continuing violation doctrine in FEHA discrimination litigation is not so much accommodation itself as a process of conciliation" (italics omitted)].) Indeed, in *Richards*, we expressly applied the continuing violation doctrine to the plaintiff's disability

discrimination claim, as well as to her disability harassment claim. Thus, we already have recognized that when the requisite showing of a temporally related and continuous course of conduct has been established, it is appropriate to apply the continuing violation doctrine to disability accommodation claims, as well as to harassment claims.[17]

Indeed, an examination of the facts of the instant case illustrates why a categorical bar on the application of the continuing violation doctrine in the retaliation context is incompatible with our previous pronouncements in this area. Here, the plaintiff alleges a retaliatory course of conduct rather than a discrete act of retaliation, and as we concluded above, a series of separate retaliatory acts collectively may constitute an "adverse employment action" even if some or all of the component acts might not be individually actionable. If, however, we were to foreclose application of the continuing violation doctrine as a matter of law in retaliation cases, the statute of limitations would start running upon the happening of the first act of retaliation, even if that act would not be actionable standing alone. A rule that would force employees to bring actions for "discrete acts" of retaliation that have not yet become ripe for adjudication, and that the employee may not yet recognize as part of a pattern of retaliation, is fundamentally incompatible with the twin policy goals of encouraging informal resolution of disputes and avoiding premature lawsuits that critically informed our analysis in *Richards* and *Romano*.[18]

Accordingly, foreclosing the application of the continuing violation doctrine in a case such as this one, where the plaintiff alleges a retaliatory *course of conduct* rather than a discrete act of retaliation, would undermine

---

[17] Moreover, as we previously have stressed, the liberal construction mandated by the FEHA extends to interpretations of the FEHA's statute of limitations: " 'In order to carry out the purpose of the FEHA to safeguard the employee's right to hold employment without experiencing discrimination, the limitations period set out in the FEHA should be interpreted so as to promote the resolution of potentially meritorious claims on the merits.' " (*Richards, supra*, 26 Cal.4th at p. 819, citing *Romano, supra*, 14 Cal.4th at pp. 493–494.)

[18] To the extent *Morgan* holds otherwise, we decline to adopt its reasoning. Unlike our cases, *Morgan* appears to give no weight to the impact of a statute of limitations on informal conciliation processes. Moreover, we note that the factual posture of the present case demonstrates a flaw in the reasoning of *Morgan*, which barred application of the continuing violation doctrine for discrimination and retaliation claims because those claims were founded on "discrete acts." As noted above, here Yanowitz alleges a retaliatory course of conduct premised on a series of interrelated retaliatory acts that, when considered collectively, constitute an adverse employment action. *Morgan* concluded that because a harassment claim is composed of a series of separate acts that collectively constitute one "unlawful employment practice," a plaintiff may assert individual components from the pre-limitations period as part of the continuing violation. (*Morgan, supra*, 536 U.S. at pp. 116–118.) Thus, because the facts alleged here, like the harassment claims discussed in *Morgan*, collectively constitute an unlawful employment practice, the analytical distinction that *Morgan* purported to draw between retaliation and harassment claims is unpersuasive.

the fundamental purpose of the FEHA by encouraging early litigation and the adjudication of unripe claims. We believe the better rule is to allow application of the continuing violation doctrine in retaliation cases if the requisite showing of a continuing course of conduct has been made. Thus, we reiterate that in a retaliation case, as in a disability accommodation or harassment case, the FEHA statute of limitations begins to run when an alleged adverse employment action acquires some degree of permanence or finality. (*Richards*, *supra*, 26 Cal.4th at p. 823.)

Turning to the applicability of the doctrine in the present case, we apply the factors outlined in *Richards*. Specifically, we consider whether "the employer's . . . actions [were] (1) sufficiently similar in kind—recognizing, as this case illustrates, that similar kinds of unlawful employer conduct, such as acts of harassment or failures to reasonably accommodate disability, may take a number of different forms [citation]; (2) have occurred with reasonable frequency; (3) and have not acquired a degree of permanence." (*Richards*, *supra*, 26 Cal.4th at p. 823.)[19] Here, Yanowitz contends that in retaliation for her refusal to follow Wiswall's discriminatory directives in the fall of 1997, L'Oreal began a campaign of retaliation that commenced with the solicitation of negative feedback from Yanowitz's subordinates in April 1998, continued with a refusal to accommodate those employees' administrative needs in May 1998, the presentation of unwarranted criticism and humiliation in the presence of these employees in June 1998, and an unwarranted negative written evaluation in a July 16, 1998 memorandum, and finally culminated with L'Oreal's refusal, after the transmittal of the July 16 memorandum, to allow Yanowitz time to respond to the charges leveled against her.

In sum, Yanowitz alleges that in the course of these actions, L'Oreal solicited or fabricated negative information about Yanowitz and then used this information to intimidate, disempower, and punish Yanowitz. We conclude that a reasonable trier of fact could find that the solicitation of negative information from subordinates, the criticism of Yanowitz both verbally and in written memos based in part on the negative information obtained from her subordinates, and the subsequent refusal to allow Yanowitz to answer the charges leveled against her, were similar in kind and occurred with sufficient frequency to constitute a continuous and temporally related course of conduct. Moreover, a reasonable trier of fact could conclude Yanowitz was not on notice that further conciliatory efforts would be futile, until her final attempts to meet with company representatives to discuss the criticism directed at her were finally rebuffed. Accordingly, in light of the evidence

---

[19] We also noted that "permanence" properly should be understood to mean "that an employer's statements and actions make clear to a reasonable employee that any further efforts at informal conciliation to obtain reasonable accommodation or end harassment will be futile." (*Richards, supra,* 26 Cal.4th at p. 823.)

submitted by the parties at the summary adjudication stage, we cannot determine that the continuing violation doctrine is inapplicable as a matter of law. (*Richards, supra,* 26 Cal.4th at p. 823.)

Furthermore, with regard to the question whether L'Oreal's alleged acts of retaliation, considered collectively, constitute a sufficient adverse employment action under the relevant standard (materially affecting the terms, conditions, or privileges of employment), we conclude that Yanowitz has met her burden of establishing an adverse employment action for purposes of her prima facie case. The record establishes that prior to the period relevant here, Yanowitz had been a highly rated and honored employee of L'Oreal for 18 years. In April 1998, however, her supervisors Roderick and Wiswall began to actively solicit negative information about her and then employed this information to criticize Yanowitz both in the presence of her subordinates and in written memoranda. These supervisors refused to review her response to these charges and employed the negative information received to justify new, restrictive directives regarding her future performance and to impair her effectiveness with her staff.

These actions constituted more than mere inconveniences or insignificant changes in job responsibilities. Months of unwarranted and public criticism of a previously honored employee, an implied threat of termination, contacts with subordinates that only could have the effect of undermining a manager's effectiveness, and new regulation of the manner in which the manager oversaw her territory did more than inconvenience Yanowitz. Such actions, which for purposes of this discussion we must assume were unjustified and were meant to punish Yanowitz for her failure to carry out her supervisor's order, placed her career in jeopardy. Indeed, Roderick so much as told Yanowitz that unless there were immediate changes, her career at L'Oreal was over. Actions that threaten to derail an employee's career are objectively adverse, and the evidence presented here creates a factual dispute that cannot be resolved at the summary judgment stage. (See *Noviello v. City of Boston, supra,* 398 F.3d 76 [analysis of effect of retaliatory conduct should include "the relative ubiquity of the retaliatory conduct, its severity, its natural tendency to humiliate . . . a reasonable person, and its capacity to interfere with the plaintiff's work performance."].)

Contrary to L'Oreal's assertion, this is not a case in which the plaintiff alleges merely commonplace indignities typical of the workplace. Yanowitz alleges a pattern of systematic retaliation, and numerous cases recognize that adverse employment action includes treatment similar to that here at issue. (See, e.g., *Wyatt v. City of Boston, supra,* 35 F.3d at pp. 15–16 [stating that actions other than discharge are covered by title VII's antiretaliation provision, and listing as examples "employer actions such as demotions, disadvantageous transfers or assignments, refusals to promote, unwarranted negative

job evaluations and toleration of harassment by other employees"]; *Gunnell v. Utah Valley State College* (10th Cir. 1998) 152 F.3d 1253, 1264 [holding that coworker hostility or retaliatory harassment, if sufficiently severe, can constitute adverse employment action for purposes of a title VII retaliation claim]; *Wideman v. Wal-Mart Stores, Inc., supra,* 141 F.3d 1453, 1456 [finding that written reprimands, an employer's solicitation of negative comments by coworkers, and a one-day suspension constituted adverse employment actions]; *Corneveaux v. CUNA Mut. Ins. Group* (10th Cir. 1997) 76 F.3d 1498, 1507–1508 [holding that an adverse employment action occurred when an employee was required to "go through several hoops" in order to obtain severance benefits]; *Yartzoff v. Thomas* (9th Cir. 1987) 809 F.2d 1371, 1376 ["[t]ransfers of job duties and undeserved performance ratings, if proven, would constitute 'adverse employment decisions' . . ."].)

We emphasize that we do not determine that the alleged adverse action occurred, or that it was not justified by bona fide concerns on the part of L'Oreal with regard to Yanowitz's general performance at work that might yet be proved at trial. We hold only that, at the summary adjudication stage, Yanowitz's evidence was sufficient to satisfy the adverse action element of her prima facie case. It remains for the trier of fact to decide whether Yanowitz's allegations are true.

## IV.

Finally, L'Oreal argues that the Court of Appeal erred in holding that Yanowitz met her burden of establishing that L'Oreal's stated nonretaliatory grounds for taking the actions against her were pretextual. L'Oreal points to an August 5, 1997 memo from Roderick to Sears—written months before the incident with Wiswall—that severely criticized Yanowitz for deficiencies in her "listening" skills and her "attitude," and to Yanowitz's admission that the November 1997 merger created problems in her department and left her with additional job responsibilities that may have had an impact on her performance. L'Oreal additionally proffered evidence that it had received complaints about Yanowitz from customers before and after the incidents with Wiswall and that these complaints expressed negative feedback about Yanowitz, including an expressed desire by certain corporate customers not to work with Yanowitz again.

The evidence proffered by L'Oreal does indicate that there were problems with Yanowitz's performance both before and after the incident with Wiswall, but such evidence is not sufficient in itself to support the trial court's grant of summary judgment in L'Oreal's favor. The record reflects that many of the problems identified in the negative performance reviews had been associated with Yanowitz in a number of performance reviews conducted between 1987

and 1996. Despite these criticisms, however, these same performance reviews consistently rated Yanowitz "above expectation," and in 1997—the year before the incidents here at issue—Yanowitz was awarded the sales manager of the year award. Moreover, there is no evidence that at the time of these earlier negative evaluations, L'Oreal actively solicited negative feedback about Yanowitz, berated her in the presence of her staff, or threatened to terminate her unless her performance improved. Roderick's active solicitation of negative information concerning Yanowitz in the spring of 1998 strongly suggests the possibility that her employer was engaged in a search for a pretextual basis for discipline, which in turn suggests that the subsequent discipline imposed was for purposes of retaliation. (See Lindemann & Grossman, Employment Discrimination Law (3d ed. 1996) pp. 674–675.)

Thus, we conclude that the record reveals triable issues of fact as to whether L'Oreal's heightened response to Yanowitz's allegedly poor performance—after she refused to follow Wiswall's directive—was retaliation for her protected activity under the FEHA. (*Hairston v. Gainesville Sun Pub. Co.* (11th Cir. 1993) 9 F.3d 913, 921 [reversing summary judgment on the ground of pretext and finding that when the plaintiff presented evidence of above average performance evaluations before the filing of a complaint, and unfavorable performance evaluations immediately before and after the filing of a complaint, incidents of increased scrutiny and harassment bear on the pretext issue].) Taking into account all of the evidence submitted in support of and in opposition to the summary judgment motion, there exists a *genuine issue of material fact* as to whether L'Oreal's articulated, nonretaliatory reasons for its actions were pretextual. Therefore, the Court of Appeal properly held that the trial court's grant of summary judgment in favor of L'Oreal cannot be sustained on this ground.

## V.

For the reasons stated above, we affirm the Court of Appeal's decision reversing the trial court's grant of summary judgment in favor of L'Oreal.

Kennard, J., Werdegar, J., and Moreno, J., concurred.

**CHIN, J.**—I dissent.

Plaintiff alleges she was subjected to adverse employment actions due to her opposition to a personnel order that, she now claims, she believed constituted unlawful discrimination on the basis of sex. She seeks the protection of a statute that prohibits retaliation against a person who opposes a forbidden employment practice. However, until after she filed this lawsuit, she never communicated to her employer her alleged belief that the order was

sexually discriminatory or, indeed, unlawful in any way. This case thus presents the question whether a person can be a whistleblower without blowing the whistle. At least in this case, where the personnel order was not clearly unlawful, I would say no.

The majority concludes that plaintiff may recover damages from her employer for retaliating against her because she failed to carry out a personnel order that she reasonably believed violated the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.) even if (1) the order did not, in fact, violate the FEHA; and (2) she never related her belief to her employer. I disagree. The whole point behind giving whistle-blowers special protection is to encourage them to speak out to try to prevent employment discrimination before it takes place or to expose it after it occurs. It makes no sense to give this special protection to someone, like plaintiff here, who did nothing (until after she filed a lawsuit) to communicate to her employer that she opposed what she believed to be a discriminatory act.

The trial court properly granted summary judgment in favor of defendant.

## I. SUMMARY OF RELEVANT FACTS

Plaintiff Elysa J. Yanowitz alleges the following. She was a regional sales manager based in San Francisco for defendant L'Oreal USA, Inc. (L'Oreal). Sometime during the fall of 1997, Jack Wiswall, the New York-based general manager of L'Oreal's designer fragrance division and one of Yanowitz's superiors within the company, ordered her to terminate a female salesperson because he thought she was "not good looking enough." In her declaration, plaintiff described the salesperson as a "dark-skinned woman" who she believed was "of Iranian descent." Wiswall told her something like, "Get me somebody hot."

Plaintiff did not carry out the order because she believed it was unlawful. In a declaration that she prepared for this litigation, she explained the reasons for her belief: "This was the first time in all of my years as Regional Sales Manager that anybody had ever asked me to make a final employment decision based upon the physical appearance, much less the subjective physical appearance, of an employee. And there never was any suggestion that any of the males who were under my supervision should be hired, evaluated, promoted, or fired because of their physical appearances. At the time that Wiswall gave the instruction, there was a male sales associate in Cosmair's [L'Oreal's former name] Ralph Lauren installation in Macy's San Francisco Union Square Branch. I also had a male account executive in Seattle, Washington, and until recently, or conceivably even at that time, I

had a male coordinator in Macy's San Francisco Union Square Branch. In earlier years, I had had two other male account executives. I had hired one of these individuals as a coordinator and later promoted him to an account executive. And shortly before I went out on disability leave, I had made a job offer to another male for a coordinator's position, as I recall, in Macy's Union Square Branch." Because of these facts, she "believed that it was contrary to both federal and state sex discrimination laws to terminate a female employee who was performing satisfactorily and who presented herself in a businesslike fashion because of the subjective belief of a male corporate officer that the woman did not fit his notions of physical attractiveness, when opinions as to the physical attractiveness of male employees never were taken into consideration in connection with any employment decisions."

Sometime later, when Wiswall learned that the employee had not been dismissed, he told plaintiff something like, "Didn't I tell you to get rid of her, I want her out of here." He observed a "young attractive blonde girl, very sexy," and told plaintiff to "get me one that looks that." She responded, "Jack, you've got to give me adequate reasons or justification for dismissing her." In her declaration, plaintiff states, "After the initial directive, Wiswall persisted in questioning me whether [the salesperson] had been terminated or when I would terminate her. I protested to Wiswall on a number of occasions that he had to give me a justifiable reason to terminate this employee. The matter became particularly difficult when . . . in March 1998, I learned that [the salesperson] was one of the top performers in the men's fragrance department throughout the entire chain." When asked specific questions during her deposition regarding the number of times she spoke with Wiswall on this subject, she could remember only the initial directive and a single follow-up conversation. She could not specifically remember additional conversations with Wiswall on the subject.

Plaintiff did not say anything to Wiswall to convey that she felt the order was discriminatory other than asking him to give her "adequate grounds to dismiss her." She does not allege that she told Wiswall that the salesperson in question was a top performer. She never reported to Richard Roderick, her immediate supervisor within the company, or anyone else within the company, including the human resources department, that she believed she had received a discriminatory order from Wiswall. She explained in her declaration that she said nothing to Roderick about her concerns because she "did not have any confidence that Roderick would say, much less do, anything. I found Roderick to be totally ineffectual and lacking independence." Moreover, she "did not report Wiswall to or seek assistance from [the] Human Resources Department, because I did not have any confidence that that Department would provide any assistance in dealing with Wiswall. That

Department did not have the reputation of assisting lower level employees or even middle management personnel in disputes involving upper management."

Ultimately, plaintiff did not terminate the salesperson and, apparently, no one else did either. L'Oreal also did not terminate or demote plaintiff, but she alleges that, as a result of her not terminating the salesperson, she was subjected to other adverse employment actions. She eventually departed the company on disability leave due to stress.

In this action, plaintiff alleged, among other things, that she was the victim of discriminatory retaliation due to her refusal to carry out the order to fire the female employee, an order that, she believed, would have violated "the prohibition against discrimination by sex established in the" FEHA. The trial court granted L'Oreal's motion for summary judgment, but the Court of Appeal reversed as to the retaliation cause of action. We granted L'Oreal's petition for review and must now decide whether the facts of this case state a valid cause of action for unlawful retaliation under the FEHA.

## II. DISCUSSION

### A. *Prima Facie Case of Retaliation*

Plaintiff claims L'Oreal illegally retaliated against her in violation of Government Code section 12940, subdivision (h) (section 12940(h)), part of the FEHA, which makes it an unlawful employment practice for an employer to "discriminate against any person because the person has opposed any practices forbidden under" the FEHA. She claims L'Oreal retaliated against her because she opposed Wiswall's order to fire the female sales representative. She alleges this retaliation constituted unlawful discrimination because she reasonably believed the order itself unlawfully discriminated on the basis of sex. But this allegation encounters a problem at the outset. Plaintiff did not tell L'Oreal of her alleged belief. She never told anyone within the company that she believed the order to terminate the salesperson constituted sex discrimination or, indeed, was unlawful for any reason.

The majority and I agree on the broad principles applicable to retaliation claims. "Lawsuits claiming retaliatory employment termination in violation of CFEHA are analogous to federal 'title VII' claims (Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq.; hereafter title VII), and are evaluated under federal law interpreting title VII cases." (*Flait v. North American Watch Corp.* (1992) 3 Cal.App.4th 467, 475–476 [4 Cal.Rptr.2d 522].) To establish a prima facie case of retaliation, "the plaintiff must show that he engaged in a protected activity, his employer subjected him to adverse

employment action, and there is a causal link between the protected activity and the employer's action." (*Id.* at p. 476.) As I explain, plaintiff's action founders on the first and third of these requirements; she engaged in no protected activity, and there is no causal link between the employer's action and the nonexistent protected activity. Because of this, I need not consider whether L'Oreal subjected plaintiff to any adverse employment action.

We recently explained the "need to protect whistleblowers," like plaintiff claims to be. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 475 [30 Cal.Rptr.3d 797, 115 P.3d 77] (*Miller*).) Section 12940(h) "aids enforcement of the FEHA and promotes *communication and informal dispute resolution* in the workplace." (*Miller, supra,* at p. 472, italics added.) "The FEHA's stricture against retaliation serves the salutary purpose of encouraging open communication between employees and employers so that employers can take voluntary steps to remedy FEHA violations [citation], a result that will be achieved only if employees feel free to make complaints without fear of retaliation. The FEHA should be liberally construed to deter employers from taking actions that would discourage employees *from bringing complaints* that they believe to be well founded." (*Id.* at p. 475, italics added.) We also explained that the United States Supreme Court recently expressed similar concerns in holding that "[t]itle IX of the Education Amendments of 1972 (20 U.S.C. § 1681 et seq. (Title IX)) provides the whistleblower with a private right of action for retaliation." (*Id.* at p. 475, citing *Jackson v. Birmingham Bd. of Educ.* (2005) 544 U.S. 167 [161 L.Ed.2d 361, 125 S.Ct. 1497].)

These policy concerns are valid. Employees should be able to complain about what they believe to be unlawful employment practices without fear of retaliation. But it makes no sense to extend whistleblower protection to someone, like plaintiff, who did not make any complaint, did not engage in any meaningful communication, did not seek any informal dispute resolution in the workplace, and did nothing to try to cause L'Oreal to take voluntary steps to avoid or remedy a perceived FEHA violation.

Although section 12940(h)'s language requires the person seeking its protection to oppose "any practices forbidden under" the FEHA—which seems to require that the practices actually be forbidden—courts have expanded the statute beyond its language to permit a retaliation claim by an employee "who has complained of or opposed conduct that the employee reasonably believes to be discriminatory, even when a court later determines the conduct was not actually prohibited by the FEHA." (Maj. opn., *ante,* at p. 1043, citing *Miller, supra,* 36 Cal.4th at p. 473.) I agree with this expansion and the policy behind it. But if we are to interpret the statute as not requiring conduct that was actually illegal but merely conduct the employee

*believes* to be illegal, then surely we must require that the plaintiff *communicate* this belief to the employer. It makes no sense to hold both that the conduct need not be unlawful *and* that the plaintiff need not complain of it.

A multitude of federal cases interpreting the analogous federal retaliation law supports this conclusion. An oft-cited case is *Booker v. Brown & Williamson Tobacco Co., Inc.* (6th Cir. 1989) 879 F.2d 1304 (*Booker*).) In that case, the plaintiff alleged that he had been illegally demoted due to a letter he had written to the company's human resources department that, he claimed, opposed racial discrimination. The court disagreed that the letter constituted opposition to unlawful discrimination. "An examination of the letter indicates that it is not in opposition to a violation of the Act. Booker was not contesting any unlawful employment practice; he was contesting the correctness of a decision made by his employer." (*Id.* at p. 1313.) The letter in question did claim the plaintiff was the victim of "ethnocism," a word the court could not locate in any dictionary. About this claim, the court said, "Assuming that Booker intended discrimination, we hold that a vague charge of discrimination in an internal letter or memorandum is insufficient to constitute opposition to an unlawful employment practice. An employee may not invoke the protections of the Act by making a vague charge of discrimination. Otherwise, every adverse employment decision by an employer would be subject to challenge under either state or federal civil rights legislation simply by an employee inserting a charge of discrimination." (*Ibid.*)

Other cases are to similar effect. "In order to engage in a protected opposition activity . . . , a plaintiff must make an *overt stand* against suspected illegal discriminatory action." (*Minnis v. McDonnell Douglas Technical Services Co.* (E.D.Mich. 2001) 162 F.Supp.2d 718, 739, italics added, citing *Booker*; see also *Maynard v. City of San Jose* (9th Cir. 1994) 37 F.3d 1396, 1405 [evidence did not support a retaliation claim when the plaintiff framed his complaint in terms of a "violation of the Department's hiring practices, not in terms of racial discrimination"]; *Allen v. Denver Public School Bd.* (10th Cir. 1991) 928 F.2d 978, 985 [a grievance was not "protected opposition to discrimination" when there was "nothing on the face of the document to alert the reader that discrimination is being alleged"]; *Pieszak v. Glendale Adventist Medical Center* (C.D.Cal. 2000) 112 F.Supp.2d 970, 993–994 [the plaintiff did not "point to any involvement in a protected activity" because her "complaining about Lopez' harassment does not mean that she was complaining about sexual harassment"]; *Reynolds v. Golden Corral Corp.* (M.D.Ala. 1999) 106 F.Supp.2d 1243, 1252 ["If plaintiff intended to complain to Barnes about sexual harassment, she had an obligation to tell him so or, at least, to give him sufficient facts from which he could conclude that plaintiff's problem involved conduct directed at her because of her sex"]; *id.* at p. 1253 [no valid retaliation claim because "plaintiff does not claim to have reported the alleged sexual harassment to any of Gibson's

superiors other than Barnes," and even as to Barnes, "plaintiff did not oppose, discuss or suggest unlawful sex discrimination during that conversation"]; *id.* at p. 1254, citing *Booker; Beeck v. Federal Exp. Corp.* (D.D.C. 2000) 81 F.Supp.2d 48, 55 [no case law suggests that "protected 'opposition' extends beyond open allegations of discrimination to the sort of stoic, silent endurance plaintiff alleges here"]; *Primes v. Reno* (N.D.Ohio 1998) 999 F.Supp. 1007, 1016, citing *Booker* [concluding that a "vague suggestion of racism" is "not sufficient to constitute 'opposition' under Title VII and cannot form the basis for a retaliation claim"]; *Crumpton v. St. Vincent's Hosp.* (N.D.Ala. 1997) 963 F.Supp. 1104, 1119 ["In order to be protected activity, plaintiff must present evidence showing that [the defendant's] management knew that her concern or complaints related in some way to race and a claim of being discriminated against on that basis"; merely "complaining about a supervisor's conduct" not sufficient]; *Garcia-Paz v. Swift Textiles, Inc.* (D.Kan. 1995) 873 F.Supp. 547, 559 [the statute does not protect "persons who simply champion the cause of an older worker, even if the advocate acts out of an unarticulated belief that the employer is discriminating on the basis of age. Thus, liability will not attach unless the activity in question advances beyond advocacy and into recognizable opposition to an employment practice that the claimant reasonably believes to be unlawful"]; *id.* at p. 560, citing *Booker; Aldridge v. Tougaloo College* (S.D.Miss. 1994) 847 F.Supp. 480, 484 [plaintiff's grievance was not protected expression because it did not "protest any form of sex discrimination"]; *id.* at p. 485, citing *Booker.*)

I agree with the majority that courts should not parse an employee's complaint technically. "We do not believe employees should be required to elaborate to their employer on the legal theory underlying the complaints they are making, in order to be protected by the FEHA." (*Miller, supra*, 36 Cal.4th at p. 474.) I further agree that "[a]n employee is not required to use legal terms or buzzwords when opposing discrimination. The court will find opposing activity if the employee's comments, when read in their totality, oppose discrimination." (*Wirtz v. Kansas Farm Bureau Services, Inc.* (D.Kan. 2003) 274 F.Supp.2d 1198, 1212, quoted in maj. opn., *ante*, at p. 1047.) The problem here is that plaintiff did not use *any* words to inform her employer she thought the order was unlawful sex discrimination. Her words, *in their totality*, only asked for justification; they did not hint at a concern that the personnel order constituted sex discrimination.

The court in *Garcia-Paz v. Swift Textiles, Inc., supra*, 873 F.Supp. 547, discussed how articulate an employee must be in complaining about perceived unlawful employment practices. "While some courts have indicated that vague references to unspecified discrimination are not protected, no clear rule has emerged as to the level of specificity required, and the standard employed by most courts is not exacting. [Citations.] [¶] Employees often do not speak with the clarity or precision of lawyers. At the same time, however,

employers need not approach every employee's comment as a riddle, puzzling over the possibility that it contains a cloaked complaint of discrimination. But the thrust of inartful, subtle, or circumspect remarks nevertheless may be perfectly clear to the employer, and the Court discerns no evidence that Congress intended to protect only the impudent or articulate. The relevant question, then, is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner." (*Id.* at p. 560.)

Here, plaintiff's complaint of sex discrimination was not merely "inartful" or "subtle" or "circumspect," but nonexistent. Although, ironically, as the majority recognizes (maj. opn., *ante*, at p. 1037), plaintiff's performance reviews within the company have long and consistently criticized her "communication" skills, surely she was capable of communicating *in some fashion* her belief that Wiswall's order was unlawful sex discrimination. She never mentioned to anyone within the company that she felt the order was discriminatory. She never explained, or even alluded to, what she articulated in her declaration—that "[t]his was the first time in all of my years as Regional Sales Manager that anybody had ever asked me to make a final employment decision based upon the physical appearance, much less the subjective physical appearance, of an employee." She kept her belief, and all of the reasons she allegedly had for that belief, entirely to herself.[1]

The majority claims that plaintiff's statement to Wiswall that she needed justification presents a prima facie case that she complained of unlawful sex discrimination. This statement, however, was not a claim of discrimination at all, much less *sex* discrimination. As L'Oreal aptly points out, "a manager's request for 'adequate justification' from a superior could convey reservations about the wisdom or soundness of the superior's directive from a business standpoint—why seek the removal of a salesperson who (the manager believes) is doing a good job? Why needlessly risk antagonizing the important account employing the salesperson? The manager may simply be reluctant to carry out an unpleasant task directed at a person the manager personally likes or respects. Or perhaps she simply thinks the directive is 'unfair.' "

---

[1] The majority states that besides requesting justification for the order, plaintiff "additionally stated that she had hired and supervised both male and female sales associates for a number of years, and never had been asked to fire a male sales associate because he was not sufficiently attractive." (Maj. opn., *ante*, at pp. 1044–1045.) She did so state in a declaration that she prepared for purposes of this litigation, but she never said this to anyone within L'Oreal before the lawsuit.

All of these are very logical possibilities that have nothing to do with sex discrimination—or discrimination of any kind. Indeed, plaintiff herself indicates in her declaration she believed the order was a bad business decision because the salesperson in question was a top performer—information that she also apparently kept to herself. Plaintiff's mere request for justification is even further removed from a complaint of discrimination than those found too vague in the cases cited above. She did not come close to making "an overt stand against suspected illegal discriminatory action." (*Minnis v. McDonnell Douglas Technical Services Co.*, *supra*, 162 F.Supp.2d at p. 739.) Nor did she even give Wiswall, or anyone within L'Oreal, "sufficient facts from which he could conclude that plaintiff's problem involved" sex discrimination. (*Reynolds v. Golden Corral Corp.*, *supra*, 106 F.Supp.2d at p. 1252.) At most, she "was contesting the correctness of a decision made by [her] employer," which is insufficient. (*Booker*, *supra*, 879 F.2d at p. 1313.)

The majority suggests that the employer should have investigated what plaintiff meant on the off chance that she held some undisclosed belief that the order was unlawful. (Maj. opn., *ante*, at p. 1048.) But "employers need not approach every employee's comment as a riddle, puzzling over the possibility that it contains a cloaked complaint of discrimination." (*Garcia-Paz v. Swift Textiles*, Inc., *supra*, 873 F.Supp. at p. 560.) The purpose behind providing whistleblowers with special protection against retaliation is to encourage "open communication between employees and employers so that employers can take voluntary steps to remedy FEHA violations . . . ." (*Miller*, *supra*, 36 Cal.4th at p. 475.) This purpose is furthered only by requiring, as the law does, that employees overtly oppose what they believe is unlawful discrimination. Placing the onus on employers to try to find out whether an employee believes an action is discriminatory and for some reason has chosen not to speak out, does not further this purpose.

Moreover, plaintiff did not say anything—not even to seek a justification—to anyone within the company other than Wiswall. L'Oreal, her employer, is a large company. The purpose behind the retaliation statute is to encourage internal communication so the employer can avoid unlawful acts or take prompt corrective action. In order to further this purpose, arguably a plaintiff should have to complain to someone within the company other than the person who ordered the suspected unlawful conduct—someone who might be able to judge the matter objectively and take any necessary corrective action. Plaintiff alleges that she said nothing to anyone else within L'Oreal, not even the human resources department, because she did not have confidence in them. But the special protection against retaliation does not extend "to the sort of stoic, silent endurance plaintiff alleges here." (*Beeck v. Federal Exp. Corp.*, *supra*, 81 F.Supp.2d at p. 55.)

The contrast between this case and the cases the majority relies on that do find a prima facie case of protected activity could hardly be greater. In *Miller, supra,* 36 Cal.4th at pages 472–473 (see maj. opn., *ante,* at p. 1046), the plaintiffs complained repeatedly to several persons, including a "sex harassment advisor" and "Internal Affairs" about the alleged harassment. In *Wirtz v. Kansas Farm Bureau Services, Inc., supra,* 274 F.Supp.2d at page 1213 (see maj. opn., *ante,* at p. 1047), the plaintiff "repeatedly discussed his concerns . . . with his direct supervisor" and made "three formal complaints to the defendant's management." In *Truskoski v. ESPN, Inc.* (D.Conn. 1993) 823 F.Supp. 1007, 1012 (see maj. opn., *ante,* at p. 1048), the plaintiff's complaint of the disparate impact of a staffing policy "had definite overtones of gender bias and discrimination." And in *Mathieu v. Norrell Corp.* (2004) 115 Cal.App.4th 1174, 1187 [10 Cal.Rptr.3d 52] (see maj. opn., *ante,* at p. 1048), the plaintiff "presented evidence she told Dunn 'everything' about [the complained of] conduct and that 'such treatment, being directed to her as a [woman], constitutes sexual harassment.'" Here, by contrast, plaintiff said nothing that had even an *overtone* of sex discrimination.

I do not doubt that a personnel order might be so blatantly discriminatory—for example, an order to fire all African-American employees—that any employer would know that it was unlawful and would further know that an employee's failure to carry it out was due to the belief (actually *knowledge*) that it was discriminatory. This is not that case, and the majority does not appear to claim it is; indeed, the majority stresses that the order need not actually have been discriminatory at all for plaintiff to prevail. (Maj. opn., *ante,* at p. 1043.) Wiswall ordered the salesperson's termination due to her appearance. Plaintiff has never claimed she believed the order was unlawful discrimination on the basis of appearance (a ground not explicitly covered by the FEHA; see maj. opn., *ante,* at p. 1044), but instead she claims she believed it was *sex* discrimination. She based this belief on a chain of reasoning grounded on several facts, which she kept to herself. Whether she was correct or not, the order, by itself, was not so blatantly discriminatory on the basis of sex as to place L'Oreal on notice that plaintiff was opposing an act of sex discrimination.

Plaintiff has also shown no causal link between any protected activity and the alleged adverse employment actions. First, as I have explained, she engaged in no protected activity. Second, even if she had done so, no evidence exists that L'Oreal *knew* she was engaging in such activity. " 'Essential to a causal link is evidence that the employer was aware that the plaintiff had engaged in the protected activity.' " (*Morgan v. Regents of University of California* (2000) 88 Cal.App.4th 52, 70 [105 Cal.Rptr.2d 652], quoting *Cohen v. Fred Meyer, Inc.* (9th Cir. 1982) 686 F.2d 793, 796; see also

*Mulhall v. Ashcroft* (6th Cir. 2002) 287 F.3d 543, 551 [plaintiff "failed to produce any direct or circumstantial evidence from which a reasonable jury could infer that Metcalfe and Ray *knew or were aware of his protected activity*"].) A person cannot retaliate against someone for activity the person does not know about. To prevail on the claim, plaintiff would have to show that L'Oreal "retaliated against [her] *because* [she] complained of sex discrimination." (*Jackson v. Birmingham Bd. of Educ., supra*, 544 U.S. at p. 184 [125 S.Ct. at p. 1510].) This she cannot do. Plaintiff does not claim that anyone within L'Oreal other than Wiswall knew of her protected activity, for she said nothing whatever to anyone else. Even as to Wiswall, no *evidence*, direct or circumstantial, exists that he knew of plaintiff's alleged belief. The reason for this conclusion is simple. Plaintiff kept her belief, and the reasons for it, a secret from her employer.

### B. Statute of Limitations

While my conclusion that plaintiff has failed to state a prima facie case of retaliation makes further discussion unnecessary, I comment briefly on another aspect of the majority's analysis. Four years ago, in *Richards v. CH2M Hill, Inc.* (2001) 26 Cal.4th 798 [111 Cal.Rptr.2d 87, 29 P.3d 175], I joined a majority to conclude that where an employer's course of conduct constitutes a "continuing violation" of an employee's rights under the FEHA, the statute of limitations begins to run only when the course of conduct ends, or when the employee is on notice that further informal efforts to end it will be futile. (*Richards*, at p. 823.) More recently, the United States Supreme Court has determined, for purposes of analogous federal antidiscrimination laws, that one cannot recover for "discrete acts" of discrimination or retaliation falling outside the applicable limitations period. On the other hand, the high court held, where a "hostile work environment" claim is presented, and any of the acts contributing to the hostile environment took place within the limitations period, the employer's related earlier behavior may also be considered for the purpose of assessing liability. (*National Railroad Passenger Corporation v. Morgan* (2002) 536 U.S. 101, 105 [153 L.Ed.2d 106, 122 S.Ct. 2061].)

In concluding here that L'Oreal's hostile acts may be considered collectively, though some occurred more than one year before plaintiff filed her FEHA claim, the majority seems to feel it must choose between *Richards* and *Morgan*, and it elects to repudiate *Morgan* and adhere to *Richards*. I see no need for this approach. On the instant facts, *Morgan* itself supports the majority's statute of limitations conclusions.

Thus, plaintiff did not frame her FEHA retaliation claim in terms of discrete, individually forbidden acts occurring both within and without the

limitations period. Instead, she alleged explicitly that the employer's retribution took the form of harassment arising from an ongoing hostile work environment. The majority so analyzes the claim, insisting that it "need not and do[es] not decide whether each alleged retaliatory act constitutes an adverse employment action in and of itself," because plaintiff "has alleged that L'Oreal's actions formed a pattern of systematic retaliation for her opposition to Wiswall's discriminatory directive." (Maj. opn., *ante*, at p. 1055.) As the majority notes, such a theory of retaliation is valid; "there is no requirement that an employer's retaliatory acts constitute one swift blow, rather than a series of subtle, yet damaging, injuries. [Citations.]" (*Ibid.*)

The majority does not contravene *Morgan* by acknowledging that the entire course of L'Oreal's allegedly retaliatory conduct, both before and during the applicable limitations period, may be considered in assessing L'Oreal's FEHA liability. Thus, were it necessary for me to reach the issue, I would agree with the majority that the statute of limitations does not bar collective consideration of this conduct. In doing so, however, I would avoid deciding whether *Richards* should survive *Morgan* to the extent the two decisions disagree.

## III. CONCLUSION

As the United States Supreme Court recently reaffirmed, retaliation claims serve a valuable purpose by protecting whistleblowers. (*Jackson v. Birmingham Bd. of Educ., supra,* 544 U.S. 167 [125 S.Ct. 1497].) The objective of protecting against discriminatory practices " 'would be difficult, if not impossible, to achieve if persons who complain about sex discrimination did not have effective protection against retaliation.' " (*Id.* at p. 180 [125 S.Ct. at p. 1508].) But the majority distorts the retaliation cause of action beyond all recognition. It now says plaintiffs claiming illegal retaliation need not complain of what they believe to be an unlawful employment practice until *after* they file the lawsuit. But it makes no sense to extend this special protection to a person who did not communicate to the employer—in any way, shape, or form—the belief that unlawful sex discrimination was occurring before filing a lawsuit for retaliation. Section 12940(h) protects *opposition* to unlawful employment practices, not merely the failure to obey a personnel order because of an undisclosed belief the order is discriminatory for reasons also undisclosed. The FEHA's purpose is to prevent discrimination, not to encourage employees to generate lawsuits quietly. The majority encourages the generation of stealth lawsuits but does nothing to further the purpose of the retaliation cause of action or the FEHA itself.

To receive the special protection that section 12940(h) gives to whistle-blowers, one must blow the whistle—not in any technical way, but in *some* way. Plaintiff did not do so. Hence, I would reverse the judgment of the Court of Appeal, which reversed summary judgment in defendant's favor.

Baxter, J., concurred.