Filed 11/27/19; Certified for Publication 12/19/19 (order attached)

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| JOHN DOE, | |
| Plaintiff and Appellant, | E071224 |
| v. | (Super.Ct.No. BLC1600160) |
| DEPARTMENT OF CORRECTIONS AND REHABILITATION, | OPINION |
| Defendant and Respondent. | |

APPEAL from the Superior Court of Riverside County. Burke Strunsky, Judge. Affirmed.

Law Offices of Frank S. Moore and Frank S. Moore for Plaintiff and Appellant.

Xavier Becerra, Attorney General, Chris A. Knudsen, Assistant Attorney General, Celine M. Cooper and Michael J. Early, Deputy Attorneys General, for Plaintiff and Respondent.

John Doe, who used to work as a psychologist at Ironwood State Prison (Ironwood), sued his former employer, the California Department of Corrections and Rehabilitation (CDCR), under the California Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.),[1] alleging discrimination, retaliation, and harassment based on disability. Doe also alleged CDCR violated FEHA by failing to accommodate his two disabilities, asthma and dyslexia, by relocating him to a cleaner and quieter office and providing him with requested computer equipment. Finding no triable issues of material fact, the trial court granted summary judgment in favor of CDCR. We affirm.

## I

## FACTS

The parties submitted the following evidence in support of their arguments at the summary judgment stage.

In August 2007, Doe submitted an employment application with CDCR for a permanent psychologist position. The application asks applicants to check the boxes that apply to them, one of which is for disabled individuals, and states, "DISABLED—A person with a disability is an individual who . . . has a physical or mental impairment or medical condition that limits one or more life activities, such as . . . learning . . . or working; . . . has a record or history of such impairment or medical condition; . . . or is regarded as having such an impairment or medical condition." Doe did not check the

---

[1] Unlabeled statutory citations refer to the Government Code.

2

disabled box, and, at his deposition in this case, acknowledged he had signed the application under penalty of perjury.

Doe began working as a psychologist at Ironwood in 2012. In 2013, he submitted an accommodation request using CDCR's standard form. He requested "Time to read and write in a work space that's quiet to help w/focus and concentration." In response to the form's question, "What are your limitations?" he wrote, "(LD NOS) reading, written expression." The parties agree that LD NOS stands for "learning disorder not otherwise specified."

On January 9, 2013, Doe met with a staff member of CDCR's "Return to Work," the department that handles accommodation requests. They requested Doe provide medical documentation of the nature and extent of his limitations in order for CDCR to determine which accommodations, if any, it could provide. Doe received a memo dated January 16, 2013 from Return to Work stating his request remained pending "due to lack of medical substantiation." Doe submitted a note from his physician, Dr. Kim, dated January 24, 2013, which said: "Please provide [Doe] with a quite [*sic*] workplace that will help with attention and concentration. He is easily distracted and, under stress, can become disorganized. Extended time should also help him by reducing the pressure and allowing him to successfully complete assignments."

3

Dr. Bresee, Doe's supervisor at the time, submitted a written response to Doe's accommodation request on March 7, 2013. The response says, "By the time I met with [Doe] in early February [2013], we had already done all that we were able to do . . . to provide an appropriate work space that was as free from distraction as was possible." Dr. Bresee explained that all mental health offices had two work stations and all clinicians had to share their offices with another clinician. He said Doe's office mate had agreed to switch desks so Doe could have the desk he found less distracting. But Doe was not satisfied after the switch and complained to Dr. Bresee that he felt like he was the only psychologist who didn't have a private office.

Dr. Bresee added, "Ideally, as we move forward, [Doe] will be able to spend more of his time doing almost all of his work in the Mental Health offices on the yards. We are temporarily sharing them, but that should be ending soon. That is what we are moving to. In this way he will see an inmate and when that is done he can use the office as a solo office to finish his paperwork." Dr. Bresee's remark about private offices "on the yards" was a reference to Ironwood's upcoming transition to the "complete care model," a way of organizing the prison's work spaces so its various healthcare professionals (e.g., psychologists, nurses, and dental practitioners) are located closer to the inmates they serve.

According to Doe, switching desks with his office mate did not solve the distraction problem and, at his doctor's direction, he took a three-month medical leave "due to stress." Doe said when he returned to work, he was given a quieter, less

distracting office but, because he knew the arrangement was temporary, that "made it very hard for me to organize my work." He said it was still taking him too long to complete his assignments because he wasn't allowed to have a thumb drive and he hadn't been trained to use Ironwood's shared server. He said that in order to get access to his patients' records he had to ask the psychologist who worked next to him for copies. Doe said he felt he was being "discriminated against" because other Ironwood clinicians were using thumb drives at work.

In October 2013, Doe settled a different harassment lawsuit he had brought against CDCR. In exchange for a payment of $120,000, Doe dismissed the suit and released any claims he may have had against CDCR at the time, including FEHA claims.

According to Doe, the retaliation and harassment began in 2014 and was perpetrated by his supervisor at the time, Dr. Castro. Doe identified the following incidents as support for his discrimination, retaliation, and harassment claims.

On February 11, 2014, Dr. Castro had an hour-long meeting with Doe about his job performance that "felt . . . like an interrogation" because he was criticizing Doe's work. Doe said Dr. Castro got "angry and hostile" when Doe couldn't understand his "heavy accent." Doe said the meeting made him feel anxious and caused his asthma symptoms to increase. An Ironwood employee who transcribed the meeting said Dr. Castro criticized two progress report notes Doe had submitted, saying the notes appeared to be "cut and pasted" and incomplete.

5

On February 19, 2014, Doe did not come into work, and CDCR called to check on him. A watch commander at CDCR left a message saying if they didn't hear back from him they would send the police to his house for a "wellness check." At his deposition, Doe said he had sent a text message notifying CDCR he would be out that day, but learned later the text had not been received. Although he was home that day and no one ever knocked on his door, Doe believed the police had come to his property and that Dr. Castro had sent them.

On May 20, 2014, Doe wrote Dr. Castro an email asking for permission to leave work early because he was feeling ill. They had the following email exchange:

"[Doe:] Dr. Castro, I may have to leave early to see a doctor. I am anticipating leaving at 12 noon to go to the appointment.

[Castro:] You are not approved to leave. You are the only clinician available all day for [Ironwood] and as such designated PRN(1).

[Doe:] I am not feeling well and have already scheduled an appointment with a doctor for this afternoon at 2:00 p.m. What if it is contagious?

[Castro:] Only you know if this is a medical emergency.

[Doe:] I would like to go now."

Doe said he ended up leaving work to go to urgent care after he contacted a union representative for assistance.

On May 28, 2014, Dr. Castro believed Doe may have brought his personal cell phone into Ironwood (a serious rule violation) and had a watch commander escort Doe to his car. When Doe showed the watch commander that his phone was inside the car, he was allowed to go back to work.

On another occasion, Doe was assigned to be the "primary crisis person" even though he had given his supervisors advanced notice that he planned to attend a union meeting in Oakland that day. The primary crisis person is a position that rotates among Ironwood's clinicians. It entails monitoring and assessing high-risk inmates. Doe acknowledged at his deposition that all clinicians are expected to serve as a primary crisis person from time to time, but he felt work was intentionally "being piled on [him]" that day so he would have to miss his meeting. He admitted he had been able to attend the union meeting, but said he had to rush to the airport, and it had been a close call.

Around July 2014, Dr. Stoner became Doe's supervisor. In August 2014, Ironwood implemented the complete care model, and, as part of the reorganization, Doe was assigned to an office in the Bravo yard. When asked at his deposition if he had consulted with Doe before the move to see if it would pose a problem for him "in any respect," Dr. Stoner replied, "No, because actually it's not an option. I was assigning every clinician to be out on the yard." He said not only was Doe's reassignment part of the transition to the complete care model, but because Ironwood is considered a "heat institution" (it is located in Blythe), it "made sense for psychologists and all healthcare

7

employers to be assigned to a particular space so they're not having to walk all over the place in the heat."

Dr. Stoner said that after Doe learned he was being transferred to the Bravo yard, he asked if he could remain in his current office, the one he had been using since his return from medical leave. He told Dr. Stoner he didn't like the Bravo yard office because it was too "noisy." Dr. Stoner referred Doe to the Return to Work department.

On August 12, 2014, Doe submitted a second accommodation form, this time requesting: (1) permission to stay in his current office; (2) a thumb drive; (3) a small recorder; and (4) the Dragon Naturally Speaking voice-activated computer software. Once again, he described his limitations as "LD-NOS." In his declaration submitted with his opposition to summary judgment, Doe said the move to the Bravo yard office had triggered his asthma and he "reached a level of stress . . . that severely impacted my health." He said he sent emails in September 2014 to Dr. Stoner and Return to Work regarding his "frequent allergy and asthma attacks" and told them they should follow up with his physician, Dr. Kim, if they needed "further medical information."

At his deposition, Dr. Stoner said he later learned from the Return to Work coordinator that Doe had not provided sufficient information regarding his August 2014 request. "He did not provide medical substantiation documentation to the return-to-work coordinator, and that is a big piece of deciding if an employee needs a reasonable accommodation, knowing what the medical issue is. So if they don't have that important piece of information, they can't decide what the accommodation would be."

8

Dr. Stoner said Doe's requests for a thumb drive and a small recorder would never have been granted because both items were considered contraband at Ironwood. He said Ironwood's shared network, which Doe had access to, was "actually better than a thumb drive" anyway. As for the voice dictation software, Dr. Stoner later learned from the IT department that Doe ended up deciding he didn't want it because he was able to type fast enough for his purposes. At his deposition, Doe said the IT department had installed Dragon on his computer, but because it was a different version from the one he had on his home computer he "couldn't figure out how to use it." He added, "And so it wasn't that I wasn't grateful for that, it's just that I couldn't use it."

In October 2014, Doe took a second medical leave. He provided CDCR a note from Dr. Kim, dated October 7, 2014, which states: "Due to acute medical condition patient has been advised by specialist that [he] should take medical leave for 12 weeks beginning 10/8/2014."

In September 2015, the Return to Work coordinator asked Doe to sign a release of his medical records so she could obtain information about the nature and extent of his limitations. Doe refused to sign the release and directed her to speak to Dr. Kim if she needed more information.

On February 19, 2016, Doe submitted another accommodation form, requesting a "flashdrive" and the "use of a quieter room to read and complete job assignments." He described his limitations as "learning disability, reading written expression."

The record contains the following additional notes from Dr. Kim (which presumably Doe submitted to Return to Work, although nothing in the record demonstrates he did). An August 31, 2015 note states: "Please provide patient reasonable accommodation to use quiet room to complete work because of underlying medical condition. [Doe] states that central health has an office that has been helpful to complete his paperwork." A note from September 22, 2015 says: "[Doe] has a physical disability which does not impair the performance of his essential job functions. A reasonable adjustment, to a more conducive work environment, will permit him to better perform his duties and responsibilities. I recommend, as [Doe] has requested, a change of location that will provide him with some measure of privacy and freedom from the constant distraction coming activities near his current work area."

An October 30, 2015 note says: "My patient has been experiencing more frequent migraine headaches that begin at work. They have been limiting and restricting patient's ability to function during work and subsequently when he returns home. Since they seem to be triggered by his work space environment he will need accommodations to hopefully avoid his triggers or at the least minimize their affects." A note from December 4, 2015 says: "[Doe] will require the same type of space accommodation that was provided to him before, for an ongoing condition that I have been treating."

Finally, a note from Dr. Kim dated March 11, 2016 states: "Patient was seen and evaluated today for chronic work related medical condition. He would normally be able to complete the essential job functions however because of the current work environment

10

that he [*sic*] is provided to him he is not able to complete these essential job functions. This is because he develops symptoms that interfere with his ability to complete essential job functions that he is normally able to complete."

During his deposition, Doe acknowledged that not everyone who suffers from asthma would qualify as being disabled. He said his asthma rose to the level of disability when he "was made to work in a moldy office." When asked if a qualified professional had ever told him that his learning disability rendered him disabled, Doe responded, "I was told that I had a learning disability and from the literature I understand it to be a disability." When asked about the nature and extent of his disabilities, he said, "Well, I was looking through the psychologist's job description and I actually could do all of those [tasks] without any restrictions. It wasn't until I had asthma attacks and was falling behind with my work because of my dyslexia that was causing me, you know, to have headaches, . . . [that I was] just unable to do my work."

In April 2016, Doe received a report of separation from CDCR. He was on an extended leave at the time. According to Doe, he had asked for a two-year leave of absence to work for an organization called Med Alliance in New York and had been granted leave, but not for the entire period he had requested. The separation report advised Doe he should return to his position or be considered absent without leave. Doe submitted his resignation on May 10, 2016.

In July 2016, Doe filed this lawsuit against CDCR. His complaint asserts five causes of action under FEHA—(1) disability discrimination; (2) failure to engage in the interactive process; (3) failure to provide reasonable accommodations; (4) retaliation; and (5) harassment—plus a sixth cause of action for defamation.[2] After the parties submitted their evidence and argument, the trial court granted CDCR's motion for summary judgment and entered judgment in their favor.

## II

## ANALYSIS

Doe argues the court erred by summarily adjudicating his FEHA claims because they involved triable issues of material fact. We disagree.

A.    *Standard of Review*

A trial court properly grants summary judgment when there are no triable issues of material fact and the moving party is entitled to judgment as a matter of law. (Code Civ. Proc., § 437c, subd. (c).) A defendant who moves for summary judgment bears the initial burden to show the action has no merit—that is, "one or more elements of the cause of action, even if not separately pleaded, cannot be established, or that there is a complete defense to that cause of action." (*Id.*, subds. (a), (p)(2).) Once the defendant clears this initial hurdle, the burden shifts to the plaintiff to demonstrate a triable issue of material fact. (*Aguilar v. Atlantic Richfield Co.* (2001) 25 Cal.4th 826, 850-851.)

---

[2] Doe does not challenge the trial court's dismissal of his defamation claim, so we do not discuss it.

12

We review the trial court's ruling on a summary judgment motion de novo, liberally construing the evidence in favor of the party opposing the motion and resolving all doubts about the evidence in favor of the opponent. (*Miller v. Department of Corrections* (2005) 36 Cal.4th 446, 460.) We independently examine the record to determine whether there are triable issues of material fact and whether the moving party is entitled to summary adjudication as a matter of law. (*Wiener v. Southcoast Childcare Centers, Inc.* (2004) 32 Ca1.4th 1138, 1142.) "While we must liberally construe plaintiff's showing and resolve any doubts about the propriety of a summary judgment in plaintiff's favor, plaintiff's evidence remains subject to careful scrutiny. [Citation.] . . . [P]laintiff's subjective beliefs in an employment discrimination case do not create a genuine issue of fact; nor do uncorroborated and self-serving declarations." (*King v. United Parcel Service, Inc.* (2007) 152 Cal.App.4th 426, 433 (*King*).)

    B.    *Overview of FEHA*

*Discrimination*: FEHA makes it an unlawful employment practice to discharge an employee or discriminate against them in the "terms, conditions, or privileges" of employment because of a physical or mental disability or medical condition. (§ 12940, subd. (a).) FEHA defines "disability" as a physical or mental condition that "limits a major life activity," such as working. (§ 12926, subd. (j).) "Limits" is synonymous with making the achievement of a major life activity "difficult." (*Id.*, subd. (m)(1)(B)(ii).)

13

FEHA proscribes two types of disability discrimination: (1) the kind arising from an employer's intentionally discriminatory act against an employee because of their disability (disparate treatment discrimination), and (2) the kind resulting from an employer's facially neutral practice or policy that has a disproportionate effect on employees suffering from a disability (disparate impact discrimination). (*Knight v. Hayward Unified School Dist.* (2005) 132 Cal.App.4th 121, 128-129.) In this case, Doe asserted disparate treatment discrimination.

*Reasonable accommodation*: FEHA requires employers to make reasonable accommodations for employees with disabilities. "It is an unlawful employment practice, unless based upon a bona fide occupational qualification, or, except where based upon applicable security regulations established by the United States or the State of California: [¶] . . . [¶] . . . For an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee." (§ 12940, subd. (m)(1).)

*The interactive process*: FEHA makes it unlawful for an employer "to fail to engage in a timely, good faith, interactive process with the employee or applicant to determine effective reasonable accommodations, if any, in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." (§ 12940, subd. (n).)

*Retaliation*: It is also unlawful for an employer to discharge or otherwise discriminate against any person "because the person has opposed any practices forbidden under this part or because the person has filed a complaint, testified, or assisted in any proceeding under this part." (§ 12940, subd. (h).)

C.    *The Court Properly Granted Summary Judgment*

1.  *The discrimination and retaliation claims fail*

One reason Doe's discrimination and retaliation claims fail is he presented no evidence that he was subjected to an adverse employment action, which is an essential element of both claims. "A prima facie case for discrimination 'on grounds of physical disability under the FEHA requires [a] plaintiff to show: (1) he suffers from a disability; (2) he is otherwise qualified to do his job; and, (3) he was subjected to adverse employment action because of his disability.'" (*Arteaga v. Brink's, Inc.* (2008) 163 Cal.App.4th 327, 344-345 (*Arteaga*).) "[T]o establish a prima facie case of retaliation under the FEHA, a plaintiff must show (1) he or she engaged in a 'protected activity,' (2) the employer subjected the employee to an adverse employment action, and (3) a causal link existed between the protected activity and the employer's action." (*Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1042 (*Yanowitz*).)

An "adverse employment action" is one that "materially affects the terms, conditions, or privileges of employment." (*Yanowitz*, *supra*, 36 Cal.4th at pp. 1036, 1051.) "In the case of an institutional or corporate employer, the *institution or corporation itself* must have taken some official action with respect to the employee, such

15

as hiring, firing, failing to promote, adverse job assignment, significant change in compensation or benefits, or official disciplinary action." (*Roby v. McKesson Corp.* (2009) 47 Cal.4th 686, 706, 708 (*Roby*) [demoting employee to answering the office telephones during office parties and firing employee constituted adverse employment actions].) An adverse employment action refers not only to "ultimate employment actions such as termination or demotion, but also . . . actions that are reasonably likely to adversely and materially affect an employee's job performance or opportunity for advancement." (*Yanowitz*, at p. 1054.) That said, "[m]inor or relatively trivial adverse actions or conduct by employers or fellow employees that, from an objective perspective, are reasonably likely to do no more than anger or upset an employee cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment and are not actionable." (*Ibid.*)

The record contains no evidence CDCR subjected Doe to an adverse employment action. In his opposition to summary judgment, Doe argued Dr. Castro subjected him to adverse employment actions by criticizing his work during the interrogation-like meeting, ordering a wellness check on him when he was out sick, suspecting him of bringing a cell phone into work, and assigning him the primary crisis person on the same day as a union meeting. The problem is, even if we assume Dr. Castro did everything Doe accuses him of and did so maliciously, Dr. Castro's actions fall squarely into the category of relatively minor conduct that while potentially angering or upsetting to Doe, did not threaten to materially affect the terms, conditions, or privileges of his job. None of Dr. Castro's

16

actions resulted in any sort of formal or informal discipline or demotion in job responsibilities.[3] (*Yanowitz*, *supra*, 36 Cal.4th at p. 1054 ["offensive utterance[s] or even a pattern of social slights by either the employer or coemployees cannot properly be viewed as materially affecting the terms, conditions, or privileges of employment"].)

FEHA prohibits discrimination based on an employee's disability or perceived disability, but it "does 'not guarantee employees "a stress-free working environment."'" (*Arteaga*, *supra*, 163 Cal.App.4th at p. 344.) FEHA "'does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules. '[The FEHA] addresses discrimination.' . . . '[It] is not a shield against harsh treatment at the workplace.'" (*Ibid.*) "'Work places are rarely idyllic retreats, and the mere fact that an employee is displeased by an employer's act or omission does not elevate that act or omission to the level of a materially adverse employment action.'" (*Thomas v. Department of Corrections* (2000) 77 Cal.App.4th 507, 511.)

On appeal, Doe argues the fact he twice took medical leave when he didn't receive his requested accommodations constitutes an adverse employment action. This argument fails for the simple reason that the leave was Doe's action, not CDCR's. Doe requested and obtained permission to take two medical leaves. Nothing in the record suggests CDCR forced him to do so, or refused to pay him during his leaves. The cases Doe cites to support his position are unavailing. They involve situations where the employer placed the employee on unpaid, involuntary leave (*Wallace v. County of Stanislaus* (2016) 245

---

[3] Doe has not argued that his resignation in May 2016 was actually a constructive discharge.

Cal.App.4th 109, 118; *Bostean v. Los Angeles Unified School Dist.* (1998) 63 Cal.App.4th 95, 102, 110) or accused the employee for what it regarded as abuse of sick leave (*Gonzales v. City of Martinez* (N.D.Cal. 2009) 638 F.Supp.2d 1147, 1153, 1159-1160).

We also reject Doe's argument that CDCR's rejection of his accommodation requests constitutes as an adverse employment act. No court has ever held that a failure to reasonably accommodate an employee's disability—which is a separate cause of action under FEHA (§12940, subd. (m))—can qualify as the adverse action underlying a discrimination or retaliation claim. "Were the law otherwise, every time an employee was denied a requested accommodation, he would be able to 'double dip' by asserting both . . . failure-to-accommodate and . . . retaliation claims." (*McClain v. Tenax Corp.* (S.D.Ala. 2018) 304 F.Supp.3d 1195, 1206 [holding in the context of the ADA that "the mere denial of a request for a reasonable accommodation cannot be an adverse employment action giving rise to a separate . . . retaliation claim"].)

There is simply no evidence CDCR materially changed the terms or conditions of Doe's employment by, for example, firing him or reducing his position, salary, benefits, or work hours. Without any evidence of an adverse employment action, the trial court was correct to grant summary judgment in favor of CDCR on the discrimination and retaliation claims.

2. *The harassment claim fails*

Doe's harassment claim fails for a similar reason—the record contains no evidence of conduct that rises to the level of harassment. To prevail on a harassment claim under FEHA, a plaintiff must produce evidence they were subjected to "offensive comments or other abusive conduct" that is (1) based on a "protected characteristic" (here, a claimed disability) and (2) "sufficiently severe or pervasive as to alter the conditions of [his] employment." (*Serri v. Santa Clara University* (2014) 226 Cal.App.4th 830, 871 (*Serri*).) To constitute harassment, the conduct must be so objectively severe or pervasive as "'to create a hostile or abusive working environment.'" (*Id.* at p. 870.) Factors to consider in this context include the frequency of the conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with the employee's work performance. (*Ibid.*)

In addition, disability harassment is distinguishable from discrimination. (*Serri*, *supra*, 226 Cal.App.4th at p. 869.) "[D]iscrimination refers to bias in the exercise of *official actions* on behalf of the employer, and harassment refers to bias that is expressed or communicated through *interpersonal relations* in the workplace." (*Ibid.*, italics added.) "[H]arassment focuses on situations in which the *social environment* of the workplace becomes intolerable because the harassment (whether verbal, physical, or visual) communicates an offensive message to the harassed employee." (*Roby*, *supra*, 47 Cal.4th at p. 706.) Put differently, "[h]arassment claims are based on a type of conduct that is *avoidable* and *unnecessary* to job performance. No supervisory employee needs to use

19

slurs or derogatory drawings, to physically interfere with freedom of movement, to engage in unwanted sexual advances, etc., in order to carry out the legitimate objectives of personnel management. Every supervisory employee can insulate himself or herself from claims of harassment by refraining from such conduct. An individual supervisory employee cannot, however, refrain from engaging in the type of conduct which could later give rise to a discrimination claim. Making personnel decisions is an inherent and unavoidable part of the supervisory function." (*Reno v. Baird* (1998) 18 Cal.4th 640, 646.) "When the harasser is a supervisor, the employer is strictly liable for the supervisor's actions. (*Roby*, at p. 707.)

As with the discrimination and retaliation claims, Doe cites Dr. Castro's behavior towards him as the basis for his harassment claim. He argues the evidence of Dr. Castro criticizing his work during an uncomfortable meeting, suspecting him of bringing a cell phone into work, ordering a wellness check on him, piling work on him when he was supposed to attend a union conference, and withholding permission to leave early to make a doctor's appointment constitutes a pervasive pattern of abusive conduct that meets the definition of harassment. We disagree.

First of all, though Doe may have understandably found the incidents frustrating or upsetting, they were not so severe as to "alter the conditions of [his] employment" or create an "'abusive working environment.'" (*Serri*, *supra*, 226 Cal.App.4th at pp. 869-871.) This is objectively so. Workplaces can be stressful and relationships between supervisors and their subordinates can often be contentious. But FEHA was not designed

to make workplaces more collegial; its purpose is to eliminate more insidious behavior like discrimination and harassment based on protected characteristics. (*Arteaga*, *supra*, 163 Cal.App.4th at p. 344.)

Secondly, even if the incidents Doe cites did qualify as objectively severe and abusive, they still wouldn't constitute harassment because each one involved a personnel decision by Dr. Castro within the scope of his duties as Doe's supervisor. Assigning and reviewing work, approving time-off requests, and enforcing workplace rules all fall within the duties of a manager. In other words, the behavior Doe identifies is not harassment because it was not avoidable conduct superfluous to Dr. Castro's job description. That Doe felt his supervisor performed his duties in a negative or malicious way does not transform his conduct into disability harassment.

Doe's attempt to liken his negative experiences with Dr. Castro to the supervisor's treatment of the employee in *Roby* is unavailing. In that case, Roby's supervisor made demeaning comments about her body odor and arm sores, refused to respond to her greetings, and frequently made demeaning facial expressions and gestures toward her. The Court concluded this conduct constituted harassment because none of it could "fairly be characterized as an official employment action . . ., [r]ather, these were events that were unrelated to [the supervisor's] managerial role, engaged in for her own purposes." (*Roby*, *supra*, 47 Cal.4th at p. 709.) Here, in contrast, each of Dr. Castro's challenged acts fell within his job duties and—unlike Roby's supervisor's behavior, which centered on

21

Roby's physical appearance—there is no evidence of a nexus between Dr. Castro's conduct and Doe's asthma or dyslexia.

For the reasons just discussed, we also reject Doe's argument that CDCR's denial of his accommodation requests created a triable issue of harassment. The processing of such requests is an official action and CDCR had an objectively nonhostile, nonabusive reason for denying Doe's requests—lack of medical substantiation.

### 3. *The interactive process and accommodation claims fail*

The trial court properly granted summary adjudication of the interactive process and accommodation claims because CDCR presented evidence that Doe was responsible for the breakdown in accommodation discussions and Doe failed to present any evidence to the contrary that would place the issue in dispute.

Under section 12940, subdivision (m), it is an unlawful employment practice "'[f]or an employer or other entity covered by this part to fail to make reasonable accommodation for the known physical or mental disability of an applicant or employee.'" "'Two principles underlie a cause of action for failure to provide a reasonable accommodation. First, the employee must request an accommodation. [Citation.] Second, the parties must engage in an interactive process regarding the requested accommodation and, if the process fails, responsibility for the failure rests with the party who failed to participate in good faith.'" (*Avila v. Continental Airlines, Inc.* (2008) 165 Cal.App.4th 1237, 1252 (*Avila*).)

22

Section 12940, subdivision (m) requires an employer to accommodate only a "*known*" disability. (Italics added.) Thus, "'"the duty of an employer reasonably to accommodate an employee's handicap does not arise until the employer is 'aware of respondent's disability and physical limitations.'"'" (*Avila*, *supra*, 165 Cal.App.4th at p. 1252.) "The employee bears the burden of giving the employer notice of his or her disability." (*Ibid.*)

"An employee cannot demand clairvoyance of his employer." (*King*, *supra*, 152 Cal.App.4th at p. 443.) "'Where the disability, resulting limitations, and necessary reasonable accommodations, are not open, obvious, and apparent to the employer," . . . the employee bears the burden "to *specifically* identify the *disability* and *resulting limitations*, and to suggest the reasonable accommodations.'" (*Scotch v. Art Institute of California* (2009) 173 Cal.App.4th 986, 1013, italics added.) Additionally, "[a]n employer does not have to accept an employee's subjective belief that he is disabled and may rely on medical information in that respect." (*Arteaga*, *supra*, 163 Cal.App.4th at p. 347 [finding the employee's description of pain and numbness were subjective and the employer was entitled to rely on the fact that the physician returned the employee to work without any restrictions].) "Reliance on medical opinion and an individualized assessment is especially important when the symptoms are subjective and the disease is of a type that varies widely between people." (*Leatherbury v. C&H Sugar Co., Inc.* (N.D.Cal. 2012) 911 F.Supp.2d 872, 880; *Arteaga*, at p. 349 ["An individualized

23

assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person"].)

Here, the information Doe included in his accommodation request and the notes from Dr. Kim he submitted to Return to Work were not sufficient to place CDCR on notice he suffered from a disability covered by FEHA or to inform CDCR of the extent of the limitations his disability caused. First, the information Doe provided to CDCR's Return to Work department did not indicate that he suffered from asthma or dyslexia. The closest Doe came to identifying his disabilities or specifying a diagnosis was to describe his limitations as "LD-NOS." Dr. Kim's notes make only vague and generalized references to an "underlying medical condition," a "chronic work related medical condition," a "physical disability," and "migraine headaches." Second, and more importantly, Doe provided no information describing the extent of his disabilities—that is, what kind of work limitations his asthma and dyslexia caused. The most information Dr. Kim ever provided about Doe's limitations is his statement that Doe is "easily distracted and, under stress, can become disorganized." But that is true of many people, whether or not they suffer from a learning disability. Doe gave CDCR no evidence that this distraction or disorganization makes him more limited than an average baseline. (Cf. *Brown v. Bd. of Trustees Sealy Indep. Sch. Dist.* (S.D.Tex. 2012) 871 F.Supp.2d 581, 605 [evidence that plaintiff's attention deficit hyperactivity disorder adversely affected her ability to remember and concentrate on one task at a time was insufficient evidence of a disability under the ADA because it did not speak to the severity of her condition or the

specific impact on her work].) Similarly, there is no evidence that Doe gave CDCR any information about how his asthma limited his ability to work. Significantly, when the Return to Work department made an effort to obtain the information themselves, Doe refused to sign the medical release.

Information about the nature and extent of Doe's claimed disabilities was crucial to CDCR's ability to determine whether it was able to reasonably accommodate those disabilities. The lack of any evidence indicating Doe provided such information to CDCR is fatal to his interactive process and accommodation claims.

### III

### DISPOSITION

We affirm the judgment. CDCR shall recover its costs of appeal.

SLOUGH _____
J.

We concur:

McKINSTER_____
Acting P. J.

MENETREZ_____
J.

25

**CERTIFIED FOR PUBLICATION**
**COURT OF APPEAL -- STATE OF CALIFORNIA**
**FOURTH DISTRICT**
**DIVISION TWO**

JOHN DOE,                                                        E071224
   Plaintiff and Appellant,
   v.                                                      (Super.Ct.No. BLC1600160)
DEPARTMENT OF CORRECTIONS
AND REHABILITATION,                                    The County of Riverside
   Defendant and Respondent.
                                      **ORDER CERTIFYING**
                                      **OPINION FOR**
                                      **PUBLICATION**

THE COURT

      The request for publication of the opinion filed on November 27, 2019 is GRANTED. The opinion meets the standard for publication as specified in California Rules of Court, rule 8.1105(c). It is ORDERED that the opinion filed in this matter on November 27, 2019, be certified for publication.

                                               SLOUGH
                                                            J.

We concur:

McKINSTER
           Acting P. J.

MENETREZ
           J.