Filed 9/10/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| LINDA JORGENSEN,<br><br>  Plaintiff and Appellant,<br><br>  v.<br><br>LOYOLA MARYMOUNT UNIVERSITY,<br><br>  Defendant and Respondent. | B305594<br><br>(Los Angeles County<br>Super. Ct. No. YC073064) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Ramona G. See, Judge.  Reversed.

Bahar Law Office and Sarvenaz Bahar for Plaintiff and Appellant.

Musick, Peeler & Garrett, William J. Tebbe and Stephen R. Isbell for Defendant and Respondent.

_____

1

Linda Jorgensen sued Loyola Marymount University for retaliation and age and gender discrimination. (See Gov. Code, § 12940 et seq.) The trial court granted the University's motion for summary judgment but erroneously excluded evidence a University employee rejected a job candidate because she "wanted someone younger." *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 535–545 (*Reid*) explained such remarks can be relevant in age discrimination suits. Together with other evidence, they can make summary judgment inappropriate. That holds here.

We summarize Jorgensen's version of the facts.

Jorgensen started at the University in 1994. Her career went swimmingly until July 2010, when the University appointed Stephen Ujlaki to be the Dean of its School of Film and Television (which we call the School for short). Jorgensen then was over 40. She alleged Ujlaki discriminated against older female employees.

Ujlaki promoted Johana Hernandez to be an Assistant Dean at the School. At age 30, Hernandez started as an administrative assistant at the School in January 2010, a few months before Ujlaki. Jorgensen helped train Hernandez. Once Ujlaki arrived, Hernandez ingratiated herself with him: Ujlaki made Hernandez his favorite. In 2014, Jorgensen was shocked when Ujlaki promoted Hernandez to Assistant Dean, because Jorgensen believed she was far more qualified and experienced than Hernandez. To Jorgensen's dismay, Ujlaki later ordered Jorgensen to report to Hernandez.

After Jorgensen lost this promotion to Hernandez, Ujlaki and Hernandez sidelined Jorgensen and eventually left her with few duties: "In the end, I was left to watch cat videos at work . . . ." She ascribed her lost promotion and her marginalization to Ujlaki's age and gender discrimination,

facilitated by Hernandez.  Jorgensen complained but the University rejected her claims and then, she asserted, punished her for complaining.  She sued in 2018 and resigned in 2019.

The University presented a different picture.  Again we excerpt a lengthy presentation.  The University noted Jorgensen was a problem employee:  she became insubordinate when Ujlaki and his team tried to improve the way the School operated.  One new Associate Dean—a woman older than Jorgensen—described Jorgensen as "the most difficult employee I have ever had to manage by orders of magnitude."  Meanwhile, Hernandez proved herself effective and hardworking:  the University marshaled facts showing Hernandez's ascent was due to her competence, not discrimination.

The University moved for summary judgment, offering evidence of legitimate justifications for its decisions.  Jorgensen opposed the motion with declarations from Jorgensen and other older women who had worked under Ujlaki.

The University lodged objections to Jorgensen's supporting declarations, including one from Carolyn Bauer, a former School employee.

The court sustained objections to part of Bauer's declaration.  Bauer declared that, while working at the School, one Belinda Brunelle asked Bauer about an open position there—a position different from anything Jorgensen sought.  Bauer mentioned Brunelle's interest to Hernandez, who immediately responded she "wanted someone younger" for the position.

The University objected to Bauer's evidence about Hernandez's "someone younger" remark.  Its four objections were relevance, conjecture, speculation, and hearsay.

These four objections were wide of the mark.

3

First, the relevance objection was incorrect under the *Reid* decision, which extensively analyzed the federal doctrine of stray remarks:  " 'statements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself.' " (*Reid*, *supra*, 50 Cal.4th at p. 536.)  *Reid* held an "age-based remark not made directly in the context of an employment decision or uttered by a nondecision maker may be *relevant*, circumstantial evidence of discrimination." (*Id*. at p. 539, italics added.)

Judge Posner observed the probative value of a stray comment depends on the precise character of the remark. (*Shager v. Upjohn Co.* (7th Cir. 1990) 913 F.2d 398, 402 (*Shager*), quoted in *Reid*, *supra*, 50 Cal.4th at p. 539.)  The relevance increases when the declarant might " 'influence the decision.' " (*Reid*, *supra*, 50 Cal.4th at p. 540, quoting *Russell v. McKinney Hospital Venture* (5th Cir. 2000) 235 F.3d 219, 229; see also *Reid* at p. 542 ["discriminatory remarks by a nondecisionmaking employee *can* influence a decision maker"].)

Under *Reid*, Hernandez's remark was relevant because one can infer Hernandez could influence Ujlaki, the School's top decision maker on all issues, including hiring and promotion.

The Associate Dean interviews showed Hernandez's potential for influence.  A search committee identified three candidates for Associate Dean positions at the School.  As the last hurdle, each candidate attended a final interview with Ujlaki, one at a time.  Only three people attended these interviews:  the candidate, Ujlaki, and Hernandez.  Ujlaki invited Hernandez to participate, and not as a note taker:  she took no notes during the interviews.  After they interviewed the three candidates together, Ujlaki discussed with Hernandez whom to hire.  Ujlaki confided

4

to Hernandez he was "torn" about the decision. This discussion was in Ujlaki's office. The two were alone.

A jury could conclude Hernandez had Ujlaki's ear.

Other evidence corroborated this permissible inference.

Once hired, an Associate Dean noted Ujlaki put an "enormous amount of trust" in Hernandez; Ujlaki relied on her "heavily to do work for him." Hernandez was one of Ujlaki's "favorites."

Ujlaki and Hernandez were on a first-name basis. Ujlaki gave Hernandez "a series of special assignments." Flouting formal organizational lines, Hernandez effectively reported directly to Ujlaki. Ujlaki eventually created a new job classification just for Hernandez. Ujlaki asked Hernandez to observe and to report back to him on the leaders of the School's departments.

The evidence permits an inference Ujlaki trusted Hernandez as an advisor, which in turn suggests Hernandez could and did influence Ujlaki's decisions.

Under *Reid*, Bauer's testimony about Hernandez's "someone younger" comment thus was relevant. (See *Reid*, *supra*, 50 Cal.4th at pp. 535–545.)

The second objection was "speculation," but there was no speculation. Bauer quoted Hernandez word-for-word. That is not speculation.

Third, there was no conjecture, for the same reason.

Fourth, there was no hearsay problem. Hernandez's comment is within the exception for states of mind. (See Evid. Code, § 1250.) Professors Sklansky and Roth explain the basics.

"When an out-of-court statement is used as circumstantial proof of the declarant's state of mind, the hearsay rule is not

5

implicated, because the statement is not offered to prove the truth of what it asserts." (Sklansky & Roth, Evidence: Cases, Commentary, and Problems (5th ed. 2020) pp. 145–146.) For example, in *Lyons Partnership, L.P. v. Morris Costumes, Inc.* (4th Cir. 2001) 243 F.3d 789, 804, a trademark plaintiff offered evidence children shouted "Barney Barney Barney" upon seeing a person in a "Duffy" costume, not for its truth, but to prove a likelihood of confusion between the accused Duffy costume and the protected Barney mark; therefore the statements were not hearsay and the hearsay rule did not apply. (*Sklansky*, at p. 146.) "But sometimes a statement *explicitly* describes the speaker's state of mind: 'Hey, I think that's Barney!' or 'I think she's an undercover cop,' or 'I hate him.' Statements of this kind seem to qualify as hearsay when used to prove what the declarants believed, knew, or felt. But they fall within a longstanding exception for statements describing the declarant's state of mind." (*Ibid.*)

According to this accurate statement of evidence law, Hernandez *explicitly* described her state of mind when she said she was looking for somebody younger. This then was hearsay, but it fell within section 1250 of the Evidence Code because it recounted Hernandez's state of mind: Hernandez preferred younger employees.

Untrustworthiness is not a problem. Section 1250 incorporates section 1252 of the Evidence Code, which makes such statements inadmissible if circumstances suggest a lack of trustworthiness. The Law Revision Commission Comments to section 1252 highlight the significance of a speaker's motive to misrepresent or to manufacture evidence (Cal. Law Revision Com. com., 29B pt. 4 West's Ann. Evid. Code (2015 ed.) foll. §

6

1252, p. 453), but the University does not contend Hernandez had this motive.  Nor do we detect this possibility.

The state-of-mind exception therefore made admissible Bauer's report of Hernandez's remark.  Thus we do not explore whether Hernandez's words also were an admission.  (See Evid. Code, § 1222.)

In sum, the trial court erroneously excluded evidence.  This is true under any standard of review.

How does this evidentiary error affect the validity of the summary judgment?  The rule is not automatic reversal.  A stray remark alone may not create a triable issue.  (*Reid*, *supra*, 50 Cal.4th at p. 541.)  Rather, *Reid* suggests we examine the record as a whole to see if Hernandez's previously excluded comment changes the propriety of summary judgment under governing law.  (*Id.* at p. 545.)

The governing law is the familiar three-part burden-shifting test.  (*Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 354.)  First, the plaintiff must establish a prima facie case raising a presumption of discrimination.  Second, the employer may rebut the presumption by showing it acted for legitimate and nondiscriminatory reasons.  Finally, the plaintiff may attack the employer's reasons as pretextual or may offer other evidence of improper motives.  (*Id.* at pp. 354–356.)

The trial court ruled the University offered legitimate reasons for its actions and Jorgensen failed to show pretext.

Three factors show Hernandez's remark changes the pretext analysis.

First, on this record, the remark evidence is relatively strong.  Some stray remarks are ambiguous.  (See *Shager*, *supra*, 913 F.2d at pp. 400, 402–403.)  This one was not.  Moreover, the

7

evidence of Ujlaki's regard for Hernandez's advice is clear. And there is no doubt Ujlaki was the key decision maker at the School. (Cf. *Reid*, *supra*, 50 Cal.4th at p. 542 [declarants' proximity to decision makers varies greatly].) An influential advisor who makes a clearly biased comment generates relatively potent evidence in a case like this. Where there is smoke, there might be fire.

Second, Ujlaki created a pay differential between male and female Associate Deans hired concurrently. This evidence came from the same older female Associate Dean who criticized Jorgensen. Discovering this pay difference contributed to her decision in 2017 to resign after only three years. There may be innocuous explanations for this pay difference, but on this record it adds another cloud of smoke.

Third, sources unrelated to Jorgensen criticized Ujlaki's management. A faculty report asserted Ujlaki's deanship had led to "discrimination claims" and called for "a zero tolerance for discrimination, retaliation, marginalization, and harassment." An outside consultant evaluated Ujlaki's deanship and concluded the faculty consensus was the situation was "too dysfunctional to be allowed to continue" and "consideration of ending the Dean's tenure is justified." After this report, Ujlaki prematurely ended his second term as Dean. The older female Associate Dean later voiced sharp, substantial, and wide-ranging dissatisfaction with Ujlaki's leadership, calling him "unethical" and "corrupt." This is more smoke.

These elements create an ambiguous picture. How should one interpret it? The familiar rule is that, when ruling on a motion for summary judgment, the court may not weigh the plaintiff's evidence or inferences against the defendant as though

8

the court were sitting as the trier of fact.  (*Reid*, *supra*, 50 Cal.4th at p. 540; cf. *Shager*, *supra*, 913 F.2d at p. 401 ["if the inference of improper motive *can* be drawn, there must be a trial"].)  Adding Hernandez's overtly discriminatory comment to this record made summary judgment inappropriate.

As a separate matter, the University argues Jorgensen did not sufficiently argue prejudice from the court's evidence rulings. But Jorgensen cited *Reid* in her opening papers and amply explained her prejudice argument.

The University alternatively argues Jorgensen suffered no adverse employment action, but there is a disputed issue of fact as to whether the failure to promote her and the adversities she experienced thereafter were just that.  (See *Yanowitz v. L'Oreal USA, Inc.* (2005) 36 Cal.4th 1028, 1060–1061.)

Finally, the trial court did not rule on the University's motions for summary adjudication.  We do not undertake these analyses in the first instance.

### DISPOSITION

We reverse the summary judgment order, remand, and award costs to the appellant.


WILEY, J.

We concur:


GRIMES, Acting P. J.        OHTA, J.*

---

\*     Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.